## UNITED STATES COAST GUARD COURT OF CRIMINAL APPEALS
### Washington, D.C.

### UNITED STATES

#### v.

### Charlie C. BYRNE
### Chief Operations Specialist (E-7), U.S. Coast Guard

### CGCMS 24431

### Docket No. 1334

### 10 November 2011

Special Court-Martial convened by Commanding Officer, WMSL Crew Bravo - Alameda. Tried at Alameda, California, on 25 August 2009.

| | |
|---|---|
| Military Judge: | CDR Ronald J. Bald, USCG |
| Trial Counsel: | LCDR Matthew A. Braden, USCG |
| Assistant Trial Counsel: | LT Bryan R. Blackmore, USCGR |
| Defense Counsel: | LT Rebecca M. Oldfield-Frey, JAGC, USN |
| Assistant Defense Counsel: | LT Benjamin J. Voce-Gardner, JAGC, USN |
| Appellate Defense Counsel: | LT Kelley L. Tiffany, USCGR |
| | LCDR Shadrack L. Scheirman, USCG |
| Appellate Government Counsel: | LCDR Douglas K. Daniels, USCG |

### BEFORE
### McCLELLAND, McGUIRE & McTAGUE
Appellate Military Judges

McGUIRE, Judge:

Appellant was tried by special court-martial, military judge alone. Contrary to his pleas, Appellant was convicted of one specification of wrongful use of cocaine, in violation of Article 112a, Uniform Code of Military Justice. In his sentencing argument, Trial Defense Counsel requested a bad-conduct discharge to ensure appellate review of the case. (R. at 162.) The Military Judge sentenced Appellant to reduction to the grade of E-2 and a bad-conduct discharge. The Convening Authority approved the sentence.

Before this court, Appellant initially assigned the following error:

  I.   Whether the military judge abused his discretion when he admitted, over defense counsel's objection, the laboratory documentation packet, in violation of Appellant's Sixth Amendment right to confrontation.

    After we *sua sponte* ordered the parties to submit supplemental briefs addressing *United States v. Blazier*, 69 M.J. 218 (C.A.A.F. 2010), on 09 March 2011, Appellant assigned[1] the following additional errors:

  II.   Appellant was deprived of a full and fair hearing where his command unlawfully influenced prospective defense witnesses.

  III.  Appellant was denied effective assistance of counsel when his attorneys failed to properly investigate allegations of tampering with urinalysis materials and failed to advise him properly on the consequences of a conviction.

    We discuss all three issues and affirm.

### Factual Summary

    On 16 December 2008, Appellant provided a urine sample in a command-wide urinalysis, after the command randomly selected his name. (R. at 24-32.) The urinalysis coordinator mailed Appellant's sample to the Tripler Army Medical Center Forensic Toxicology Drug Testing Laboratory (hereinafter Tripler) for testing. (R. at 33, Prosecution Ex. 4 at 12.) Tripler received it on 20 January 2009 and processed it on 22, 23, 26 and 27 January 2009. (Prosecution Ex. 4 at 12-29.) Appellant's sample tested positive for cocaine metabolites. (*Id.* at 28.) On 18 February 2009, Coast Guard Maintenance and Logistics Command Pacific requested a "litigation packet" providing the testing results for Appellant's sample. (*Id.* at 6.) The enclosure to the memorandum requesting the litigation packet contained an excerpt from the Tripler computer-generated report of test results for the batch, which contained a specimen number and an associated social security number for the Appellant's specimen, indicating the sample tested positive for cocaine. (*Id.* at 7.) In response to the Coast Guard request, Ms. Judy Cho-Tupua, one of the Tripler laboratory certifying officials, certified the Laboratory Document Packet on 18 February 2009. (*Id.* at 4.) On 21 August 2009, Dr. Catherine Okano, Chief of Certification and

---

[1] *See* Appellant's Brief on Specified Issue and Motion for leave to file two Additional Assignments of Error, 20 April 2011.

Litigation at Tripler, certified the Laboratory Document Packet a second time, four days before Appellant's court-martial. (*Id.*)

The Tripler Laboratory Document Packet consists of multiple pages arranged in the following sections:

> Section 1: Summarized Laboratory Results
>
> Section 2: Document Packet Request and Official Correspondence
>
> Section 3: DD Form 2624 and TAMC FTDTL B-CHN
>
> Section 4: Initial Screening Data
>
> Section 5: Verification Screening Data
>
> Section 6: Confirmation-Extraction and GC/MS Data

Section 1 contains a memorandum, dated 18 February 2009, identified as a "Positive Drug Report" and listing the initial screen results, the Verification Screen results, and the results of the confirmation GC/MS test.[2] (Prosecution Ex. 4 at 4.) In addition to the summary test results, the memorandum contains a certification, including text indicating that the results were correctly determined by proper laboratory procedures. (*Id.*) The certification further asserts that the results are correctly summarized and prepared and maintained as a regular business practice of the laboratory. (*Id.*) The certification was signed by Ms. Judy Cho-Tupua on 18 February 2009. (*Id.*) The certification was also signed by Dr. Catherine Okano on 21 August 2009. (*Id.*)

At court-martial, the Government called the urinalysis coordinator who testified regarding the procedures used for collecting Appellant's urine sample, and the associated documentation. (R. at 24-39.) The Government also called the urinalysis observer to testify about the collection procedures and associated documentation. (R. at 40-47.) The other Government witness at court-martial was Doctor Catherine Okano, the Chief of Certification and Litigation at Tripler. (R. at 50-119.)

---

[2] While the memorandum refers, in abbreviated form, to "The GC/MS confirmatory test," this Court understands "GC/MS" to refer to Gas Chromatography and Mass Spectrometry testing to reveal the chemical compounds present in the sample tested. *See also* dialogue at p. 58 of the record.

Dr. Okano testified regarding her training and experience, and her experience as an expert in forensic urinalysis. (R. at 50-52.) Dr. Okano was recognized as an expert witness by the court without Defense objection. (R. at 52-53.) Dr. Okano also testified regarding her responsibilities at the laboratory, and the proficiency testing and inspections that the laboratory (i.e., Tripler) is required to undergo. (R. at 53-54.) Dr. Okano also testified extensively regarding the procedures used to inspect, label, batch, pour and screen the urine samples at Tripler. (R. at 54-58.) Ultimately, she provided her opinion that the person who provided the urine specimen in question was exposed to cocaine on or about 16 December 2008. (R. at 98.)

The Government offered the Laboratory Document Packet into evidence. (R. at 74.) Appellant objected on Confrontation Clause and hearsay grounds. (R. at 75.) The Military Judge admitted it, over the defense objections, as Prosecution Exhibit 4. (R. at 92, 94.)

## Admission of the Laboratory Document Packet

We begin with the first assignment of error, where Appellant asserts that the Military Judge abused his discretion when he admitted, over defense objection, the Laboratory Document Packet, in violation of Appellant's Sixth Amendment right to confrontation.

### *Standard of Review*

We review a military judge's ruling on the admissibility of evidence under an abuse of discretion standard. *United States v. Blazier* (*Blazier I*), 68 M.J. 439, 441-442 (C.A.A.F. 2010) (citing *United States v. Clayton*, 67 M.J. 283, 286 (C.A.A.F 2009)). "In order to be overturned on appeal, the judge's ruling must be 'arbitrary, fanciful, clearly unreasonable or clearly erroneous . . . .'" *United States v. Datz*, 61 M.J. 37, 43 (C.A.A.F. 2005) (citing *United States v. Taylor*, 53 M.J. 195, 199 (C.A.A.F. 2000)).

As in *Blazier I*, the threshold issue, before reaching the admissibility of the evidence, is whether the evidence in question is testimonial for purposes of Sixth Amendment analysis. Whether evidence constitutes testimonial hearsay is a question of law reviewed *de novo*. *Clayton*, 67 M.J. at 286 (citing *United States v. Foerster*, 65 M.J. 120, 123 (C.A.A.F. 2007)). An

appellate court accepts a trial judge's findings of fact unless they are clearly erroneous or unsupported by the record. *Foerster*, 65 M.J. at 123.

*Testimonial Nature of Cover Memorandum*

The Sixth Amendment to the United States Constitution provides, in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ." U.S. Const. amend. VI. The Court of Appeals for the Armed Forces, in *United States v. Clayton*, has held that the right to confront witnesses "applies to testimonial statements made out of court, because the declarant is a witness within the meaning of the Sixth Amendment, and thus the accused must be afforded the right to cross-examine that witness." *Clayton,* 67 M.J. at 287 (citing *Foerster*, 65 M.J. at 123). The Supreme Court, in *Crawford v. Washington*, held: "Testimonial statements of witnesses absent from trial have been admitted only where the declarant is unavailable, and only where the defendant has had a prior opportunity to cross-examine." 541 U.S. 36, 59 (2004).

The *Crawford* Court did not provide a precise definition of what evidence is "testimonial," but the Court identified several formulations of testimonial statements, including: "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 51-52. The Court of Appeals for the Armed Forces, in *United States v. Rankin*, identified three questions germane to distinguishing between testimonial and non-testimonial hearsay:

> First, was the statement at issue elicited by or made in response to law enforcement or prosecutorial inquiry? Second, did the "statement" involve more than a routine and objective cataloging of unambiguous factual matter? Finally, was the primary purpose for making, or eliciting, the statements the production of evidence with an eye toward trial?

64 M.J. 348, 352 (C.A.A.F. 2007).

Here, the cover memorandum in Section 1 of Prosecution Exhibit 4 is dated 18 February 2009, as is the Coast Guard memorandum in Section 2. (Prosecution Ex. 4 at 4, 6.) From this information, we conclude that the Coast Guard request for a litigation packet (i.e., the Coast

Guard Memorandum in Section 2) was the precipitating event for the preparation of the cover memorandum in Section 1. The Coast Guard memorandum was not submitted until the computer-generated report of a positive test was received by the Coast Guard. (R. at 100.) With regard to the first *Rankin* factor, we find that the statements in the cover memorandum were made in response to a request for a litigation packet, which clearly indicates that a court-martial is being contemplated, and, thus, the memorandum was prepared in response to a prosecutorial inquiry. In applying the second factor, we find that the cover memorandum summarized many pages of machine-generated data, provided interpretation of the results, and "set forth the 'accusation,'" *see Blazier I*, 68 M.J. at 443, that certain substances were present in the Appellant's urine. Thus, we conclude that the content of the cover memorandum involved more than a "routine, objective cataloging of an unambiguous factual matter." *See United States v. Magyari*, 63 M.J. 123, 126-27 (C.A.A.F. 2006) (citing *United States v. Bahena-Cardenas*, 411 F.3d 1067, 1075 (9th Cir. 2005).[3] With regard to the third *Rankin* factor, we find that the cover memorandum summarized the laboratory analyses, specified the cocaine metabolite found and the concentration of that metabolite in the Appellant's urine, and was made in response to a request for a litigation packet, all of which made its evidentiary purpose clear.

The Military Judge concluded that Prosecution Exhibit 4 (apparently *in toto*) was testimonial. (R. at 90.) In concluding that both Prosecution Exhibits 3 (DD2624)[4] and 4 were testimonial, the Military Judge stated:

> In fact, the purpose of the completed DD2624 and the documentation package is ultimately to provide evidence that an accused had a substance listed in Article 112a of the Uniform Code of Military Justice in their urine. Therefore, they are pretrial statements that the declarants would reasonably expect to be used prosecutorially. In fact, Dr. Okano's title as Chief of Certification and Litigation tends to speak to that answer.

(R. at 90.)

---

[3] This is not to say that if it contained no more than a routine and objective cataloging of an unambiguous factual matter, that would be sufficient to make it non-testimonial. In the recent opinion *United States v. Sweeney*, 70 M.J. 296, 302 (C.A.A.F. 2011), the Court of Appeals for the Armed Forces said, "First, it is emphatically not the case that a statement is automatically non-testimonial by virtue of it being a 'routine' statement of 'unambiguous factual matters.'"

[4] Prosecution Exhibit 3 as such was not admitted and is not at issue.

The recent *Sweeney* opinion teaches, if it was not already apparent, that a laboratory packet should not be analyzed *in toto*; it may be that some pages of it are testimonial hearsay while others are not. *United States v. Sweeney*, 70 M.J. 296 (C.A.A.F. 2011).

Prosecution Exhibit 4 contains a mixture of materials. For example, Section 3 of Prosecution Exhibit 4 consists largely of chain of custody documents. Sections 4 through 6 of Prosecution Exhibit 4 also contain some chain of custody documents internal to Tripler, as well as what appear to be machine-generated printouts. We will return to the other portions of Prosecution Exhibit 4 to determine whether it contains other testimonial hearsay. We agree with the Military Judge that so much of Prosecution Exhibit 4 as included the cover memorandum in Section 1 was testimonial for purposes of Confrontation Clause analysis.

This analysis is consistent with the holding in *Blazier I* that "the top portions of drug testing report cover memoranda [analogous to the Section 1 "Positive Drug Report" memorandum contained in Prosecution Exhibit 4, p. 4, in the instant case] – which summarize and clearly set forth the 'accusation' that certain substances were confirmed present in Appellant's urine at concentrations above the DOD cutoff level – are clearly testimonial." *Blazier I*, 68 M.J. at 443. The Court of Appeals for the Armed Forces reaffirmed this holding in *Blazier II*, stating that "signed, certified cover memoranda – prepared at the request of the Government for use at trial, and which summarized the entirety of the laboratory analyses in the manner that most directly 'bore witness' against Appellant – are testimonial under current Supreme Court precedent." *United States v. Blazier* (*Blazier II*), 69 M.J. 218, 221 n.1 (C.A.A.F. 2010) (citing *Melendez-Diaz v. Massachusetts*, 129 S.Ct. 2527, 2532 (2009); *Crawford*, 541 U.S. at 51-53).

Accordingly, we conclude that the cover memorandum in Prosecution Exhibit 4, p. 4, which presented the findings, including the specific cocaine metabolite and the concentration of that metabolite in Appellant's urine, and prepared after the Government's request for a litigation packet, is testimonial for purposes of the Confrontation Clause of the Sixth Amendment.

*Declarant of Cover Memorandum*

The cover memorandum at issue in this case is distinct from those at issue in *Blazier* in one significant regard: In *Blazier II*, the cover memoranda were described as follows:

> The cover memoranda, prepared in response to a Government request for use at court-martial, list the results and the corresponding Department of Defense cutoff levels for illegal substances, followed by the certification and signature of a "Results Reporting Assistant, Drug Testing Division": Marin Jaramillo for the June test and Andrea P. Lee for the July test. The bottom portion of each memorandum is a signed and sworn declaration by Dr. Vincent Papa, the "Laboratory Certifying Official," confirming the authenticity of the attached records and stating that they were "made and kept in the course of the regular conducted activity" at the Brooks Lab.

*Blazier II*, 69 M.J. at 220. In this case, the cover memorandum in Section 1 of Laboratory Document Packet, which provides a summary of the test results and the Department of Defense cutoff level (similar to the memoranda in *Blazier*), does not contain a certification or signature of anyone other than a laboratory certifying official, who certifies the test results and also certifies that the components of the packet are official or business records. (Prosecution Ex. 4 at 4.) Thus, the procedures followed by the Tripler laboratory are distinct from those of the laboratory whose records were reviewed in *Blazier*. In effect, the results of the testing at Tripler are not complete until a certifying official reviews the test results and signs (certifies) a cover memorandum. Indeed, when asked by Trial Counsel whether there was a positive or negative determination made for a sample without the services of a certifying official, Dr. Okano stated: "No." (R. at 86.) Thus, unlike the cover memoranda at issue in *Blazier*, the cover memorandum in this case does not contain the testimonial statement of a "Results Reporting Assistant, Drug Testing Division" who did not testify at trial. Further, the function of the Tripler certifying official is much more than to certify documents as business or official records, in contrast to the function of Dr. Papa, the certifying official in *Blazier*.

The cover memorandum includes the certification of another certifying official, Ms. Cho-Tupua, who signed the memorandum well before Dr. Okano did. (Prosecution Ex. 4 at 4; R. at 62.) This raises a question as to whether Dr. Okano was merely adding her signature to her predecessor's certification. Dr. Okano testified that her signature on Prosecution Exhibit 4 signified: "That I have reviewed the--all the documents of this packet as well as the results to

make sure that they are scientifically, forensically and technically acceptable." (R. at 62.)  The Military Judge asked for clarification in her role as a certifying official:

> MJ: Can you please tell me what your responsibilities are as a certifying--certifying official with regard to a document package?
>
> WIT: We look at the original documents or the printouts of the--all the chain of custody documents, as well as the printouts of all the analysis, and we make sure that they're scientifically, forensically, technically correct so that we can make a call one way or another whether it's positive or negative.

(R. at 84).  The record also contains this exchange between the Military Judge and Dr. Okano as he was considering his ruling on the Defense objection to the admission of Prosecution Exhibits 3 and 4:

> MJ: Ma'am, how do you decide that a package can be certified?
>
> WIT: Again, I look at all the original documents, make sure that it's--all the chain of custody is intact, that all the controls are acceptable, that the operating parameters are acceptable, that all the acceptability criteria put forth in the DOD regulations as well as our standard operations--SOPs, standard operating procedures, are met, and I make my decision.
>
> MJ: You do all that before you would sign as a certifying official?
>
> WIT: Yes.

(R. at 85-86.)  The Military Judge, in interpreting the role of Dr. Okano and the other certifying official, concluded:

> I don't see the certifying official acting as a clerk to authenticate or provide a copy of an otherwise admissible record.  Indeed, I find that the certifying official is actually creating a record, in the case of Prosecution Exhibit 4 for identification, the document package, for the sole purpose of providing evidence either for or against a defendant.

(R. at 91.)  The Military Judge further concluded:

> I find that Dr. Okano and any certifying official putting together a document package is making testimony to the contents of that package which they have individually certified on their own.  Therefore, bringing the certifying officer into court in order to be subject to cross-examination by the defendant meets the requirements of the confrontation clause.

(R. at 92.)

It is apparent that the Military Judge believed that Dr. Okano made an independent certification, an independent out-of-court statement, and was not simply a substitute witness, as well as that she was not merely a clerk. We agree. In contradistinction to Dr. Papa who testified in *Blazier*, we find that Dr. Okano was not testifying as a surrogate witness concerning the out-of-court statements of others.

While Ms. Cho-Tupua's certification was completed earlier than Dr. Okano's, we see it as neither more nor less than the certification made by Dr. Okano. We perceive no basis to conclude that Ms. Cho-Tupua was significantly more involved in the testing process, or direct supervision of it, than Dr. Okano. Thus, while Ms. Cho-Tupua is clearly a declarant of page 4 of Prosecution Exhibit 4, it is equally clear that Dr. Okano is also a declarant, based on her description of the certification process she followed.

Appellant had full opportunity to cross-examine Dr. Okano regarding the potential for tampering, the potential for spontaneous production of the cocaine metabolite, and innocent ingestion, as well as any other aspect of the testing process and the Laboratory Document Packet. (R. at 99-122.) Accordingly, the Confrontation Clause is satisfied with regard to the cover memorandum, page 4 of Prosecution Exhibit 4, by the appearance at trial of Dr. Okano, a declarant of the cover memorandum.

Since the other certifying official, Ms. Cho-Tupua, made a similar certification statement, we consider whether it was necessary for Appellant to have the opportunity to cross-examine the other certifying official. The Court of Appeals for the Armed Forces has stated, in *Blazier II*: "We hold that where testimonial hearsay is admitted, the Confrontation Clause is satisfied only if the declarant of that hearsay is either (1) subject to cross-examination at trial, or (2) unavailable and subject to previous cross-examination." 69 M.J. at 222. The *Blazier II* Court also addressed who is the witness: "While reasonable minds may disagree about what constitutes testimonial

10

hearsay, there can be no disagreement about who is the witness the accused has the right to confront. That 'witness' is the declarant." *Id.*

Here, Ms. Cho-Tupua was a declarant, and would have been an appropriate witness.[5] Her statement on the cover memorandum was identical to Dr. Okano's.[6] We believe Ms. Cho-Tupua's testimony was not required.

We conclude that the Military Judge did not abuse his discretion in admitting, over defense objection, the cover memorandum of the Laboratory Document Packet, page 4 of Prosecution Exhibit 4, with regard to the Confrontation Clause of the Sixth Amendment.

*Testimonial Nature of Specimen Custody Document*

Section 3 of the Laboratory Document Packet, Prosecution Exhibit 4, contains a "Specimen Custody Document," DD Form 2624. (Prosecution Ex. 4 at 11-12.) The Specimen Custody Document lists specimens and identifiers for them, the laboratory accession numbers for the specimens, and the results of testing. (*Id*. at 11.) Further, the Specimen Custody Document contains the following certification: "I certify that I am a laboratory certifying official, that the laboratory results indicated on this form were correctly determined by proper laboratory procedures, and that they are correctly annotated." (*Id*.) This certification was signed by Roberta J. LaTorre Cole, a certifying official. (*Id*.) The certification is identical to the specimen custody document certification at issue in *United States v. Sweeney*, 70 M.J. 296, 299 (C.A.A.F. 2011). In *Sweeney*, the Court of Appeals for the Armed Forces held that the certification on the specimen custody document, identified in the dissenting opinion as DD Form 2624, is testimonial: "Such a formal certification has no purpose but to function as an affidavit." *Id.* at 304. The *Sweeney* Court went on to hold: "Because the declarant [of the specimen custody document certification], 'R. Flowers,' was not subject to cross-examination, admission of the specimen custody document plainly and obviously violated the Confrontation Clause." *Id.*

---

[5] Appellant did not complain at trial about the absence of Ms. Cho-Tupua, but rather about laboratory testing personnel. (R. at 67-68, 74, 76, 77, 78.) Ms. Cho-Tupua signed some additional pages of the laboratory documentation packet as a certifying official, but there is reason to believe that she did not conduct any tests. Dr. Okano testified that a person who conducts tests does not review their own work. (R. at 100.)

[6] Dr. Okano was, if anything, more qualified than Ms. Cho-Tupua; she testified that she was in charge of the certifying officials. (R. at 51, 87.)

Here, the specimen custody document was signed and certified by Ms. Roberta J. LaTorre Cole, who did not testify at trial. (Prosecution Ex. 4 at 11.) In accord with *Sweeney*, we hold that the admission of the certification on the specimen custody document in Prosecution Exhibit 4 violated the Confrontation Clause.

We conclude that the Military Judge abused his discretion in admitting, over defense objection, page 11 of Prosecution Exhibit 4, with regard to the Confrontation Clause of the Sixth Amendment.

*Remainder of Prosecution Exhibit 4*

Section 3 of the Laboratory Document Packet, Prosecution Exhibit 4, contains, in addition to page 11 described above, a chain of custody page of the Specimen Custody Document and a "Labelling and Pouring Chain of Custody" document from Tripler. (Prosecution Ex. 4 at 12-13.) These documents record the movement of specimens to and within the laboratory, with dates beginning 20 January 2009, when the specimens were released to the U.S. Postal Service for transport to the laboratory for testing, and ending 28 January 2009. Sections 4-6 of Prosecution Exhibit 4 contain chain of custody documents internal to Tripler. (Prosecution Ex. 4 at 15, 19-20, 26-27.) These documents were completed prior to the Coast Guard request for a litigation packet. The dates of the signatures were all on or before 28 January 2009, which is before the request for a litigation packet was made on 18 February 2009.

Sections 4-5 of Prosecution Exhibit 4 each contain an "Assay Review" page with several signatures, dated 22 January 2009 and 23 January 2009 respectively. (Prosecution Ex. 4 at 16, 21.) Section 6 contains a page headed "Batch Report" with several signatures dated 27 January 2009. (Prosecution Ex. 4 at 29.) Dr. Okano testified that these pages reflected reviews to verify that testing had been conducted properly. (R. at 64, 70.)

Applying the *Rankin* factors, set forth above, we conclude that the chain of custody portions of Sections 3-6 described above are not testimonial. Appellant acknowledged at trial that they are not, and has not raised an issue concerning them before us. (R. at 79.) Again

applying the Rankin factors, we conclude that the review pages of Sections 4-5 are not testimonial. We find that the materials recorded therein constitute the types of records that are most commonly admissible as business records or public records.[7] Under the framework of *Ohio v. Roberts*, 448 U.S. 56 (1980), non-testimonial hearsay is admissible if the statement falls within a firmly rooted hearsay exception. *Rankin*, 64 M.J. at 353; *see also United States v. Magyari*, 63 M.J. 123, 128 (C.A.A.F. 2006). We find that the Military Judge did not abuse his discretion in admitting the chain of custody and review documents in Prosecution Exhibit 4, under the business record and public record hearsay exceptions, M.R.E. 803(6) and M.R.E. 803 (8) respectively.

The remaining content of Sections 4-6 of Prosecution Exhibit 4, the Laboratory Document Packet, consists largely of machine-generated printouts of raw data and calibration charts. (R. at 63-65, 70-72.) The Court of Appeals for the Armed Forces noted in *Blazier II*: "First, it is well-settled that under both the Confrontation Clause and the rules of evidence, machine-generated data and printouts are not statements and thus not hearsay – machines are not declarants – and such data is therefore not 'testimonial.'" *Blazier II*, 69 M.J. at 224. Appellant acknowledges this. Like the Court of Appeals for the Armed Forces, we have no trouble finding that these portions of Prosecution Exhibit 4 are not hearsay at all, and thus are readily admissible. *Id.* at 225-226.

One significant page of Prosecution Exhibit 4 remains that is not included in any of the foregoing discussion. Page 28 in Section 6 is, as Dr. Okano testified, "the results sheet and the signature of the laboratory certifying official who reviewed the assays."[8] (R. at 65.) This page lists ten specimens, with, among other information, the result, "positive" or "negative" for the drug "COC." The specimen with the identifying number associated with Appellant shows a positive result. During trial, Dr. Okano was asked on direct examination for that result. The defense objected on hearsay grounds, pointing out that the document had not been admitted into evidence yet, while acknowledging that "it's a machine-read result." (R. at 66.) The Military Judge sustained the objection "for hearsay." (R. at 69.)

---

[7] These materials have little or no substantive content. They are only relevant when considered in conjunction with specific evidence of test results.

[8] In fact, the sheet is signed by four laboratory certifying officials, all on 27 January 2009.

In *Sweeney*, the Court of Appeals for the Armed Forces expressed concern about the admission of "the cocaine confirm data review sheet." 70 M.J. at 305. That description sounds very much like page 28 of our Prosecution Exhibit 4. In *Sweeney*, there had been no objection at trial to admission of the drug testing report. *Id.* at 306. The court held that admission of any data review sheets, including the cocaine confirm data review sheet, did not constitute plain error. *Id.* In view of the court's expression of concern and the fact that in this case there was an objection, it behooves us to carefully consider whether page 28 contains testimonial hearsay.

As already noted, page 28 lists ten specimens with their test results. The list is followed by four entries under the heading "Certifying Official Reviewers." Each entry comprises a signature, a stamped impression consisting of a name and the title "MT, Certifying Official", and the date.

As we look at page 28 to determine whether it contains relevant hearsay, that is, an out-of-court statement offered for its truth, we see two possibilities. One is the "Result": "Positive" next to Appellant's specimen laboratory accession number. As far as the record shows, this is a machine-generated statement and thus not hearsay.[9] The other possibility is that we are to read that "Result" together with the name of each certifying official, i.e., that each certifying official is adopting the result as her own statement. In an abundance of caution, we will take the latter approach. We must then determine whether these four identical statements by the four certifying officials who signed the page are testimonial.

As in *Sweeney*, these are "neither formalized, affidavit-like statements . . . nor statements made in a formal setting." 70 M.J. at 305 (citations omitted). Applying the *Rankin* factors, we think they are not testimonial. The Military Judge did not err in admitting page 28.

---

[9] This is based on the defense concession. Dr. Okano was not asked and did not say whether the material was machine-generated.

*Harmless Error Analysis*

We have concluded that the Military Judge erred in admitting page 11 of Prosecution Exhibit 4. "We grant relief for Confrontation Clause errors only where they are not harmless beyond a reasonable doubt. Among other factors, we consider the importance of the unconfronted testimony in the prosecution's case, whether that testimony was cumulative, the existence of corroborating evidence, the extent of confrontation permitted, and the strength of the prosecution's case." *Sweeney*, 70 M.J. at 306 (citations omitted).

The most cogent evidence against Appellant consists of the cover memorandum, page 4 of Prosecution Exhibit 4, and the testimony of Dr. Okano, the expert. Dr. Okano explained the nature of the testing completed at Tripler and described the significance of the various components of Prosecution Exhibit 4, which tended to demonstrate the reliability of the process in maintaining the identity of a specimen, protecting it from contamination, and ensuring the accuracy of test results. (R. at 63-65, 70-71.) She explained the cover memorandum. (R. at 62, 96-98.) She testified that in her expert opinion, based on her education, professional experience, examination of the testing documents and the quality control reports, the individual who provided a certain urine specimen was exposed to cocaine on or about 16 December 2008. (R. at 98.) Other evidence clearly showed that that urine specimen came from Appellant: the testimony of the urinalysis coordinator and the observer regarding the testing procedures, and the document that identified the specimen that Appellant provided, using his social security number, which matches the social security number on the cover memorandum. (R. at 26-47; Prosecution Ex. 1.)

The rest of Prosecution Exhibit 4, including chain of custody and review pages and the machine-generated results of the urinalysis screens and the GC/MS confirmatory test, illustrate Dr. Okano's testimony. Taken together with it, they may add credibility to her testimony. However, the specific indicator of a positive test result, even with the formal certification found on the DD2624 (page 11 of Prosecution Exhibit 4), is unlikely to have had any effect on this Military Judge as factfinder. This document is the same as Prosecution Exhibit 3 for identification. (R. at 61-62.) Prosecution Exhibit 3 for identification was described as the

DD2624 and was offered into evidence.[10] (R. at 58-59, 73.) Appellant objected, whereupon the Military Judge held it to be testimonial and excluded it from evidence because the declarant was not present to testify. (R. at 90, 92.)

Given the Military Judge's decision to exclude the DD2624 as Prosecution Exhibit 3, it is clear that he understood its certification was not to be considered. Therefore we see no reasonable probability that that certification might have contributed to Appellant's conviction. The admission of it as part of Prosecution Exhibit 4 was harmless beyond a reasonable doubt.

*Hearsay Analysis Beyond Sixth Amendment*

Beyond the question of whether the Confrontation Clause was violated by admission of Prosecution Exhibit 4, it is also necessary to consider whether the exhibit should have been barred as hearsay. The Military Judge concluded that Prosecution Exhibit 4, apparently in its entirety, was a business record and a public record, pursuant to M.R.E. 803(6) and 803(8), respectively:

> Regarding Prosecution Exhibit 4 for identification and the hearsay objection raised by the defense, I am overruling that objection. I find that forensic laboratory reports are listed specifically as hearsay exceptions in both MRE 803(6) and MRE 803(8). Therefore the hearsay objection is overruled. I am going to admit into evidence Prosecution Exhibit 4 for identification; the words "for identification" will be stricken.

(R. at 94.) As already noted, the machine-generated portions of Prosecution Exhibit 4 are not hearsay at all. We consider the issue as to the remainder of the exhibit.

As the Supreme Court stated in *Melendez-Diaz*, documents kept in the regular course of business may ordinarily be admitted at trial despite their hearsay status. 129 S.Ct. at 2538. However, the Court continued: "But that is not the case if the regularly conducted business activity is the production of evidence for use at trial." *Id*. (citing *Palmer v. Hoffman*, 318 U.S. 109, 114 (1943) (holding that an accident report provided by an employee of a railroad company did not qualify as a business record because, although kept in the regular course of the railroad's

---

[10] Prosecution Exhibit 3 for identification as such was omitted from the record. This is harmless since the same page is contained in Prosecution Exhibit 4.

operations, it was "calculated for use essentially in the court, not in the business")).  The Court continued: "The analysts' certificates – like police reports generated by law enforcement officials – do not qualify as business or public records for precisely the same reason." *Id*.; *see also Blazier II,* 69 M.J. at 226 n.8.  The Court further explained the relationship between the business and official records hearsay exceptions and the Confrontation Clause:

> Business and public records are generally admissible absent confrontation not because they qualify under an exception to the hearsay rules, but because – having been created for the administration of an entity's affairs and not for the purposes of establishing or proving some fact at trial – they are not testimonial.  Whether or not they qualify as business or official records, the analysts' statements here – prepared specifically for use at petitioner's trial – were testimony against petitioner, and the analysts were subject to confrontation under the Sixth Amendment.

*Melendez-Diaz*, 129 S.Ct. at 2539-40.

We do not view this as a holding that the analysts' certificates could not qualify as business records even if the Confrontation Clause were satisfied, but even if it was, the *Melendez-Diaz* Court was analyzing the business record and public record exemptions found in Federal Rule of Evidence 803.[11]  Military Rule of Evidence 803(6), setting forth the business record exception, contains additional language relevant here: "Among those memoranda, reports, records, or data compilations normally admissible pursuant to this paragraph are enlistment papers, . . . forensic laboratory reports, . . . ."  M.R.E. 803(6), Manual for Courts-Martial, III-40.

Similarly, M.R.E. 803(8), regarding the public record exception, includes additional language:

> Notwithstanding (B), the following are admissible under this paragraph as a record of a fact or event if made by a person within the scope of the person's official duties and those duties included a duty to know or to ascertain through appropriate and trustworthy channels of information the truth of the fact or event and to record such fact or event: enlistment papers, . . . forensic laboratory reports, . . . .

M.R.E. 803(8), Manual for Courts-Martial, III-41.

---

[11] *See Melendez-Diaz,* 129 S.Ct. at 2538.

In the circumstances of this case, where the Confrontation Clause requirements have been satisfied and given the language of M.R.E. 803(6) and 803(8), we conclude that the Military Judge did not abuse his discretion in admitting Prosecution Exhibit 4 as a business record and a public record.[12]

### Unlawful Command Influence

Appellant contends that the command unlawfully interfered with Appellant's ability to work with and produce witnesses in his defense, in that the Command Senior Chief, who was Appellant's supervisor (R. at 128), actively criticized and ordered members of the crew to break off contact with Appellant. He further contends that the Government intimidated potential defense witnesses through an overly aggressive investigation into Appellant's personal life.

To establish unlawful command influence, "an appellant must (1) allege sufficient facts which, if true, constitute unlawful command influence; (2) show that the proceedings were unfair; and (3) show that the unlawful command influence was the proximate cause of that unfairness." *United States v. Stombaugh*, 40 M.J. 208, 213 (C.M.A. 1994) (internal quotation marks omitted). The same analysis applies to an allegation of unlawful interference with access to witnesses. *Id.* Once the accused has met the burden of production and proof, the burden shifts to the Government to persuade this court beyond a reasonable doubt that the findings and sentence have not been affected by command influence. *Id.* at 214.

Appellant's evidence in support of his assertions consists of an affidavit from a potential defense witness who did not testify, but whose written statement was admitted at trial. Concerning the first contention, the witness's affidavit says that shortly after she learned that Appellant "had come up positive on his urinalysis," the Command Senior Chief held a meeting with all the first class petty officers who worked with Appellant including herself,[13] and told them that Appellant had tested positive for cocaine and the chances of it being a false positive

---

[12] Footnote 8 of the *Blazier II* opinion, referred to above, appears to apply the *Melendez-Diaz* discussion of the Federal Rules of Evidence business records exception to our practice, despite the fact that the Military Rules of Evidence business records exception is different. If so, we view it as dictum, rendered without full consideration.

[13] The Command Senior Chief was their supervisor as well as Appellant's.

were very slim; that Appellant would no longer be in the office and they were not to talk to Appellant about anything concerning the unit; and that Appellant had been dishonest about a lot of things. (App. A to Brief on Specified Issue and Motion for Leave to File Two Additional Assignments of Error, dated 29 April 2011, at 1.) On later occasions, the Command Senior Chief had other negative things to say about Appellant. (*Id.* at 2.)

Contrary to Appellant's contention, the Command Senior Chief did not order members of the crew to break off contact with Appellant, but only ordered them not to talk with him about anything concerning the unit. This was not improper. His disparaging remarks do not amount to unlawful command influence. Furthermore, there is no evidence at all to show that these communications, even if improper, had any impact on the trial.

Concerning Appellant's second assertion, the same witness's affidavit says that after she agreed to be a character witness for Appellant, she received a phone call from what turned out to be a representative of the Government, asking what appear to us to be cross-examination questions. (*Id.*) She then told Appellant and his attorneys that she was not comfortable testifying; after discussion with counsel, "it was decided that I would write a statement and not testify." (*Id.*)

There is nothing apparently improper about the phone call from the Government representative. In any event, according to an affidavit by Appellant's counsel, the decision to use the witness's written statement instead of testimony was based on the Government's potential cross-examination of the witness on prior misconduct by Appellant. (App. 2 to Government's Brief on Specified Issue and Opposition to Appellant's Motion for Leave to File Additional Assignment of Error, dated 27 April 2011, at 2.)

We are convinced beyond a reasonable doubt that this case was not affected by unlawful command influence.

**Ineffective Assistance of Counsel**

Appellant asserts that his trial defense counsel failed to investigate potentially critical defenses, and gave him incorrect advice to the effect that if convicted, he would lose his retirement benefits.

The test for resolving an issue of ineffective assistance of counsel was established by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668 (1984), and was incorporated into military law by *United States v. Scott*, 24 M.J. 186 (C.M.A. 1987); *see also United States v. Caldwell*, 48 M.J. 834, 835 (C.G.Ct.Crim.App. 1998). "First, Appellant must show that counsel's errors were so serious that he was not functioning as the counsel guaranteed by the Constitution's Sixth Amendment. Next, Appellant must demonstrate that counsel's deficient performance resulted in prejudice, which deprived him of a fair trial, that is, one whose result is reliable." *Caldwell*, 48 M.J. at 835. Appellant must overcome a presumption that the actions challenged were part of a sound trial strategy. *Strickland*, 466 U.S. at 689 (citing *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

An affidavit from trial defense counsel makes it clear that counsel did, in fact, investigate the matters Appellant mentions, and made well-reasoned judgments not to raise them at trial. (App. 1 to Government's Brief on Specified Issue and Opposition to Appellant's Motion for Leave to File Additional Assignment of Error, dated 27 April 2011, at 1-2.) Appellant states in his affidavit that his attorneys never looked into one of the matters. (App. B to Brief on Specified Issue and Motion for Leave to File Two Additional Assignments of Error, dated 29 April 2011, at 3.) But his statement is surely speculative; it is unlikely that he would be aware of all investigative efforts by counsel. *See United States v. Ginn*, 47 M.J. 236, 248 (C.A.A.F. 1997).

Concerning retirement benefits, the affidavits of both trial defense counsel are uniformly to the effect that they informed Appellant that in the event of conviction, he was very likely to be separated without retirement benefits, and that his best chance for retaining his retirement might be to ensure appellate review by requesting a bad-conduct discharge, given the unsettled state of the law concerning admissibility of the result of the test of his urine sample, following the

Supreme Court's *Melendez-Diaz* decision a few months earlier. (App. 1 to Government's Brief on Specified Issue and Opposition to Appellant's Motion for Leave to File Additional Assignment of Error, dated 27 April 2011, at 2-3; App. 2 to Government's Brief on Specified Issue and Opposition to Appellant's Motion for Leave to File Additional Assignment of Error, dated 27 April 2011, at 2-3.) The Military Judge also questioned the Appellant in some detail regarding the effect of his request for a bad-conduct discharge, including the fact that if he were not awarded a punitive discharge by the court-martial, his command may initiate an administrative separation. (R. at 163-165.)

Appellant's affidavit does not conflict with the affidavits of counsel, except to the extent that the latter indicate he was informed that the loss of his retirement was likely but not a certainty if he was convicted.[14] Assuming the advice was that loss of his retirement was a certainty in the event of conviction, that is not so far from the truth as to establish an error so serious that counsel was not functioning as the counsel guaranteed by the Constitution's Sixth Amendment. Furthermore, we believe the error, if any, was not prejudicial, as there is no reasonable likelihood that Appellant would not have received a bad-conduct discharge in the event that he hadn't requested it. Appellant's counsel were not ineffective.

### Decision

We have reviewed the record in accordance with Article 66, UCMJ. Upon such review, the findings and sentence are determined to be correct in law and fact and, on the basis of the entire record, should be approved. Accordingly, the findings of guilty and the sentence, as approved below, are affirmed.

Chief Judge McCLELLAND & Judge McTAGUE concur.

---

[14] Appellant signed a "BCD Striker" Advisement, indicating that he understood the trial strategy for requesting a BCD to preserve an automatic appeal opportunity. (Appellate Ex. XVIII.) A key sentence reads: "I understand that if I am convicted, the United States Coast Guard will deprive me of my retirement benefits."



For the Court,


Andrew Alder
Deputy Clerk of the Court