**UNITED STATES**

v.

**Senior Airman Candice N. Cimball
SHARPTON, United States
Air Force**

**ACM 38027**

U.S. Air Force Court of Criminal Appeals

Sentence adjudged 18 August 2011 by
GCM convened at Keesler Air
Force Base, Mississippi.

06 September 2013

Military Judge: William T. Cumbie (sitting alone).

Appellate Counsel for the Appellant: Captain Luke D. Wilson.

Appellate Counsel for the United States: Colonel Don M. Christensen; Lieutenant Colonel C. Taylor Smith; Major Brian C. Mason; Captain Benjamin A. Beliles; and Gerald R. Bruce, Esquire.

Before ROAN, HELGET, and WEBER, Appellate Military Judges

OPINION OF THE COURT

WEBER, Judge:

At a general court-martial before a military judge sitting alone, the appellant pled not guilty to one specification of larceny, in violation of Article 121, UCMJ, 10 U.S.C. § 921; one specification of fraudulent enlistment, in violation of Article 83, UCMJ, 10 U.S.C. § 883; and three specifications of cocaine and oxycodone use, in violation of Article 112a, UCMJ, 10 U.S.C. § 912a. The military judge found her guilty of the larceny[1] and fraudulent enlistment specifications, as well as one specification of oxycodone use and one specification of cocaine use. He found her not guilty of the remaining oxycodone use specification, and sentenced her to a bad-conduct discharge, confinement for 12 months, payment of a $20,000.00 fine and further confinement of an additional 6 months if the fine was not paid, and reduction to E–1. The convening authority approved the sentence as adjudged, with the exception of the contingent confinement.

On appeal, the appellant argues that the guilty finding as to the larceny specification is legally and factually insufficient. She also raises issues concerning the statute of limitations' effect on the fraudulent enlistment charge. She further asserts that trial defense counsel were ineffective for not seeking to suppress evidence derived from the Government's search of her urine, and contends that expert testimony linking her urinalysis sample to the positive results found in the drug testing report violated her Sixth Amendment[2] right to confront the witnesses against her. We disagree. Finding no error prejudicial to the substantial rights of the appellant, we affirm.

*Legal and Factual Sufficiency*

In July 2010, a government purchase card (GPC) approving official for the Keesler Air Force Base (AFB) medical clinic accessed a website to approve GPC purchases made by cardholders. She noticed that the appellant—an authorized GPC holder—had made some apparently unauthorized purchases from places such as the Base Exchange and the Class VI store. The approving official did not confront the appellant about these matters at the time. The next month, she noticed similar questionable charges under the appellant's GPC. Again, she did not confront the appellant about the purchases because the appellant was at Airman Leadership School. Finally, in September 2010, after noticing still more questionable purchases made with the appellant's GPC, the approving official notified authorities. The ensuing investigation revealed that the appellant used her GPC to make about $20,000 in unauthorized personal purchases, mostly gift cards.

At trial, the appellant pled not guilty to a larceny charge and specification based on her misconduct, but she did not contest the underlying facts the prosecution put forth.[3] The prosecution introduced the appellant's confession to GPC misuse, financial statements from the appellant's purchases during the charged time frame, testimony from the GPC approving official, receipts from retailers showing the appellant used her GPC on several occasions to buy gift cards and other personal items, security camera footage of the appellant making unauthorized purchases, and testimony of a base financial analyst that the Government pays bills generated by GPC purchases. The prosecution also presented documents showing the Government ultimately paid for the appellant's unauthorized purchases, a fact to which the parties later stipulated.

■ The appellant asks this Court to set aside the guilty findings as to Charge I and its Specification because the evidence is not factually or legally sufficient to support her conviction. Specifically, she argues that the victim in this case was not the United States

1. The military judge excepted the words "military property" from the larceny specification.

2. U.S. Const. amend. VI.

3. The appellant sought to enter conditional pleas of guilty, subject to review of pretrial motions she had raised. Pursuant to Rules for Courts–Martial 910(a)(2) and (b), the Government declined to consent to the appellant's guilty pleas, and the military judge entered pleas of not guilty for the appellant.

Air Force (as the Government charged), but the GPC merchant, U.S. Bank.

■ We review issues of factual and legal sufficiency de novo. *United States v. Washington,* 57 M.J. 394, 399 (C.A.A.F.2002).

■ "The test for factual sufficiency 'is whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of the [appellant]'s guilt beyond a reasonable doubt.'" *United States v. Reed,* 54 M.J. 37, 41 (C.A.A.F.2000) (quoting *United States v. Turner,* 25 M.J. 324, 325 (C.M.A.1987)). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington,* 57 M.J. at 399.

■ "The test for legal sufficiency of the evidence is 'whether, considering the evidence in the light most favorable to the prosecution, a reasonable factfinder could have found all the essential elements beyond a reasonable doubt.'" *United States v. Humpherys,* 57 M.J. 83, 94 (C.A.A.F.2002) (quoting *Turner,* 25 M.J. at 324). "[I]n resolving questions of legal sufficiency, we are bound to draw every reasonable inference from the evidence of record in favor of the prosecution." *United States v. Barner,* 56 M.J. 131, 134 (C.A.A.F.2001) (citations omitted). Our assessment of legal and factual sufficiency is limited to the evidence produced at trial. *United States v. Dykes,* 38 M.J. 270, 272 (C.M.A.1993) (citations omitted).

The applicable elements of the offense of larceny are:

(1) That the accused wrongfully took, obtained, or withheld certain property from the possession of the owner or of any other person;

(2) That the property belonged to a certain person;

(3) That the property was of a certain value, or of some value; and

(4) That the taking, obtaining, or withholding by the accused was with the intent permanently to deprive or defraud another person of the use and benefit of the property or permanently to appropriate the property for the use of the accused or for any person other than the owner.

*Manual for Courts–Martial, United States (MCM ),* Part IV, ¶ 46.b.(1) (2008 ed.).

The appellant relies on *United States v. Lubasky,* 68 M.J. 260 (C.A.A.F.2010), to contend that the victim of unauthorized GPC transactions is the card's issuer or the business establishment where the goods were purchased, not the Government. In *Lubasky,* the appellant was assigned to help an elderly widow with financial matters, but he misused her credit cards to make personal purchases for his own benefit. A court-martial convicted him of larceny of property from the widow. Our superior court, however, held that the victim of the larceny was actually the merchant who issued the credit card or the merchant selling the goods. The Court relied upon the discussion to Article 121, UCMJ, which states, "Wrongfully engaging in a credit, debit, or electronic transaction to obtain goods or money is an obtaining-type larceny by false pretense. Such use to obtain goods is usually a larceny of those goods from the merchant offering them." *Id.* at 263 (quoting *MCM,* Part IV, ¶ 46.c.(1)(h)(vi) (2002 ed.)).

We hold that *Lubasky* is inapplicable to the situation here, and therefore the finding of guilt on the larceny charge and specification is legally and factually sufficient. The underlying rationale in *Lubasky,* as in the discussion to Article 121, UCMJ, is that larceny involving credit cards is based on false pretense. If Person A receives a credit card in her name from the credit card issuing company, that company authorizes Person A to expend credit on its behalf. When Person B takes the card from Person A and expends that credit, the victim may be the credit card company because the credit card company made no such agreement with Person B. Person B has falsely pretended that he has the authority to expend the credit card company's credit, credit which was actually is-

sued to Person A. Alternatively, the merchant selling the goods may be the victim because Person B has obtained items of value from that merchant, who gave up the goods on the understanding that Person B was actually Person A and that the credit card issuer had a credit agreement with Person A that would protect the merchant.

Here, however, the situation is markedly different. The Government formed a contract with U.S. Bank to have U.S. Bank issue GPCs to authorized cardholders, who were in turn permitted to expend funds only for authorized government purchases. Under this arrangement, the Government appointed the appellant as its representative to obligate Government funds through GPC purchases. US Bank, in turn, issued a GPC in the appellant's name. The appellant did not steal the card from someone else and pretend to be a different person. Rather, she exceeded the scope of her agreement with the Government by using a card issued in her name to expend credit on unauthorized, personal purchases. Unlike Lubasky, who purported to be an authorized user of the credit card but in fact was not, the appellant here was authorized to use the GPC, but did so in a manner not sanctioned by the Air Force.

At the time of the various transactions, the appellant had not misrepresented her authority to either the merchant or U.S. Bank to use the card. As far as U.S. Bank was aware, the appellant had full authority to use the GPC. Because the Air Force was required to reimburse the bank for purchases made by authorized users of the card, the bank suffered no loss and therefore could not be a "victim" of the larceny as the Air Force was monetarily liable for the appellant's use of the card. The appellant violated her agreement with the Air Force, and as a result, the Air Force became liable to U.S. Bank to pay for the purchases. The Government did in fact fulfill its obligation, resulting in the Government spending about $20,000 in funds it otherwise would not have had to spend. US Bank was in no way a victim in this situation, and there is no evidence in the

record that the Government could have recouped its payments from U.S. Bank, or that it in fact did so.[4]

In *Lubasky*, the Court held that unauthorized debit card transactions (as opposed to credit card purchases) were properly charged as a larceny from the cardholder under the facts of that case. The Court reasoned that the larcenist obtained access to the widow's account by false pretenses—by saying or agreeing that he would only use the funds in the manner authorized—and that the larcenist had no authority to spend the widow's funds outside the limits she established. *Id.* at 264. The instant case does not involve debit card transactions per se, but the analogy is appropriate. As with a debit card where the cardholder is liable for unauthorized purchases someone else makes, here the Government was ultimately liable for the unauthorized purchases the appellant made. The appellant's misconduct could not have been charged as a larceny from the merchants offering the goods, because those merchants made a sale for which they were compensated, and therefore they did not lose anything of value. Similarly, the appellant's misconduct could not have been charged as a larceny against U.S. Bank, because U.S. Bank was wholly repaid for the appellant's purchases, just as it would be for authorized purchases. The only victim in this case was the United States Air Force, whose funds were obligated by the appellant's unauthorized, repeated purchases for her personal use. The conviction as to Charge I and its Specification is legally and factually sufficient.

### Statute of Limitations

■ The appellant next asserts that the statute of limitations on the fraudulent enlistment charge had expired by the time the summary court-martial convening authority signed for receipt of the charges, thereby barring her prosecution for this offense. The appellant also raises this issue in three other related ways, arguing that the military

---

4. This is in contrast to the normal credit card larceny situation presented in *United States v. Lubasky,* 68 M.J. 260 (C.A.A.F.2010). In that situation, the original named recipient of the stolen credit card is generally protected from unauthorized charges in excess of $50. *See* 15 U.S.C. § 1643(a).

judge erred by failing to advise her of the statute of limitations, the court-martial lacked jurisdiction to try her for fraudulent enlistment because the statute of limitations had expired, and trial defense counsel were ineffective for failing to raise the statute of limitations as a bar to her prosecution for fraudulent enlistment. For ease of organization, we will discuss all these issues as one.

■ The interpretation of the statute of limitations under Article 43, UCMJ, 10 U.S.C. § 843, is a question of law to be reviewed de novo. *United States v. Lopez de Victoria*, 66 M.J. 67, 73 (C.A.A.F.2008).

■ Article 43, UCMJ, states that for most offenses under the Code (with certain exceptions not relevant here), a person charged with a UCMJ offense is not subject to trial by court-martial if the offense was committed more than five years before the receipt of sworn charges and specifications by the summary court-martial convening authority. The statute of limitations begins to run the moment the offense is completed. *Toussie v. United States*, 397 U.S. 112, 115, 90 S.Ct. 858, 25 L.Ed.2d 156 (1970). Under Article 83, UCMJ, the offense of fraudulent enlistment has been completed when four elements have been met:

(1) The accused was enlisted or appointed in an armed force;

(2) The accused knowingly misrepresented or deliberately concealed a certain material fact or facts regarding qualifications of the accused for enlistment or appointment;

(3) The accused's enlistment or appointment was obtained or procured by that knowingly false representation or deliberate concealment; and

(4) Under this enlistment or appointment that accused received pay or allowances or both.

*MCM*, Part IV, ¶ 7.b.(1) (2005 ed.). Under this last element, acceptance of food, clothing, shelter, or transportation from the Government constitutes receipt of allowances unless the item is furnished to the accused while the accused is in custody, confinement, arrest, or other restraint pending trial for fraudulent enlistment or appointment. *MCM*, Part IV, ¶ 7.c.(2).

At trial, the appellant did not raise any issue concerning the statute of limitations. However, the parties did thoroughly litigate the question of the appellant's guilt as to the fraudulent enlistment charge, revealing the following timeline:

4 January 2006: The appellant met with an Air Force recruiter to discuss the process of applying for an Air Force enlistment.

27 January 2006: The appellant signed an Air Force Form 2030, *USAF Drug and Alcohol Abuse Certificate*, (1 December 1999), falsely stating that she had never experimented with or used any illegal drugs or narcotics. In fact, in 2004 she had been arrested and questioned for suspected narcotics abuse, and she confessed to police that she occasionally smoked oxycontin.

6–7 February 2006: The appellant visited the Military Entrance Processing Station (MEPS) to be tested and evaluated. While there, the appellant was accepted into a career field and took her enlistment oath on 7 February 2006.

26 March 2006: The appellant received a sweatshirt from her Air Force recruiter for bringing in four leads to the recruiter in her capacity in the delayed enlistment program.

2 May 2006: The appellant began active duty in the Air Force and re-signed her Air Force Form 2030, again certifying that she had never used any illegal drugs or narcotics.

21 April 2011: Receipt of charges by the summary court-martial convening authority.

Both parties center the dispute on this issue on whether the appellant received pay or allowances in the form of shelter or clothing before she entered active duty on 2 May 2006. The appellant argues that the statute of limitations began to run on one of two dates: 1) 6 February 2006, when the military paid for the appellant's overnight stay at a hotel during her MEPS processing, or 2) 26 March 2006, when she received a sweatshirt in return for her efforts in the delayed enlistment program to provide recruiting leads.

Under the appellant's interpretation, the statute of limitations would have expired before receipt of charges on 21 April 2011. The Government, in contrast, argues that the statute of limitations did not begin to run until 2 May 2006, when the appellant reported for active duty. The Government contends that there is no evidence that the appellant was provided with a hotel room overnight during her MEPS processing, and that the sweatshirt was a de minimis promotional item, not a true allowance of clothing under her enlistment.

We find that the offense of fraudulent enlistment was not completed until 2 May 2006, the day the appellant reported for active duty. As to the hotel room the Government purportedly provided the appellant on the night of 6 February 2007, there is no evidence of such in the record. The recruiter's notes do indicate that the appellant completed her MEPS processing over the course of two days. However, there is no evidence that the MEPS processing was completed out of town or that the appellant was provided lodging at government expense. We find no evidence in the record that the Government provided a hotel room or other shelter to the appellant before 2 May 2006.

The question of whether receipt of the sweatshirt on 26 March 2006 caused the statute of limitations to begin to run requires more discussion. The modern fraudulent enlistment Article has appeared in substantially the same form at least since the 1920 Articles of War. Courts and commentators reviewing

the offense over the years have noted that the requirement for receipt of pay or allowances under the enlistment plays a pivotal role in the offense because the remainder of the misconduct encapsulated in the offense takes place before the military gains jurisdiction over the accused or the subject matter.[5] The requirement for receipt of pay or allowances under the enlistment necessarily means that the accused must have been subject to the UCMJ in receiving the pay or allowances, for the receipt of pay or allowances under the enlistment is the only portion of the misconduct that provides the military the ability to prosecute the offense. The "pay or allowances" language in Article 83, UCMJ, mirrors the "pay or allowances" language in Article 2(c), UCMJ, 10 U.S.C. § 802(c), which makes a person subject to the UCMJ who is serving with an armed force even if not on active duty. In other words, a person does not complete the crime of fraudulent enlistment until that person accepts pay or allowances after becoming subject to the UCMJ, or receives pay or allowances sufficient to cause him or her to become subject to the UCMJ. In the case of a person not already subject to the UCMJ, this acceptance of pay or allowances under the enlistment must be sufficient to render the person subject to the UCMJ under Article 2(c), UCMJ, which in turn grants the military justice system the authority to punish what otherwise was pre-service conduct.

Under this framework, we have no difficulty finding that the appellant's receipt of a

5. *See e.g.*, William Winthrop, *Military Law and Precedents* 734 (2d ed. 1920 reprint) (while prior versions of the fraudulent enlistment article may not have been triable by court-martial since the offense would have wholly occurred before a period of military service, "the receipt of 'pay' or an 'allowance' under an enlistment knowingly fraudulent *is* an offence, because the pay [or allowance] is not received till the enlistment has been completed and the party is actually in the military service. It is thus the receipt of pay or of an allowance ... which is the gist of the legal offence and which in fact constitutes it.") (emphasis in original); *In re Carver*, 103 F. 624, 625 (C.C.D.Me.1900) ("It may well be doubted whether, under the constitution, fraudulent enlistments can be made offenses punishable by court-martial; but there can be no question that the receipt of pay or allowances after fraudulent enlistment may be made so punishable."); *Revi-*

*sion of the Articles of War: Hearing Before a Subcomm. Of the H.R. Comm. On Military Affairs*, 64th Cong. 41 (1916) (Judge Advocate General Major General Enoch H. Crowder raising concerns about a fraudulent enlistment article that focused solely on pre-service fraudulent conduct, but noting that "that fraudulent act, connected with his receipt of pay and allowances under the fraudulent enlistment, is what our statute makes a military offense"); *United States v. Taylor*, 15 C.M.R. 232, 235 (C.M.A.1954) (identifying receipt of pay or allowances under an enlistment as a "necessary element" to the offense of fraudulent enlistment); *United States v. King*, 27 C.M.R. 732, 735 (A.C.M.R.1959) (noting that the "gravamen of this offense" has remained that after the fraudulent procuring of an enlistment, "the accused subsequently received pay or allowances thereunder").

sweatshirt did not constitute sufficient "allowances" such as to complete the offense of fraudulent enlistment. The evidence in the record gives no indication about the value or nature of this sweatshirt, but it would be illogical to suggest that had the appellant committed another offense on 27 March 2006, the military justice system would have had jurisdiction over her simply because she had accepted a sweatshirt one day earlier. The Secretary of the Air Force is responsible for conducting intensive recruiting campaigns which include creating, producing, and distributing advertising materials to inform the public about Air Force personnel needs and career opportunities. Air Force Instruction (AFI) 36–2015, *Air Force Recruiting Advertising Program,* ¶ 1 (23 May 1994). The Air Force Recruiting Service specifically authorizes the distribution of sales promotional items to enhance recruiter efforts and promote prospecting by delayed entry program members such as the appellant. Air Force Recruiting Service Instruction (AFRSI) 36–2001, *Recruiting Procedures for the Air Force,* ¶ 9.30.1.2 (1 August 2012). A sweatshirt may be "clothing," but it is not an "allowance" under the enlistment sufficient to complete the offense of fraudulent enlistment any more than a promotional pen or coffee mug would be. The appellant did not otherwise accept any pay or allowances before beginning active duty.[6] Because the appellant did not receive any pay or allowances before she began active duty on 2 May 2006, the statute of limitations had not expired when the summary court-martial convening authority received charges.

Since we find the statute of limitations had not expired before the summary court-martial convening authority received charges, the military judge did not err by failing to advise her concerning the statute of limitations. The court-martial had jurisdiction to try her for this offense. Similarly, trial defense counsel were not ineffective in failing to raise a motion on these grounds, since such a motion would have been unsuccessful.

6. The prosecution introduced records demonstrating that the appellant's military pay began

### Ineffective Assistance of Counsel

■ On 7 February 2011, the appellant attended a medical appointment at which she sought a refill of her anxiety medication. The appellant's primary care manager noted that the appellant was shaking and had pinpoint pupils, leading her to suspect that the appellant was under the influence of narcotics. The primary care manager also referred the appellant to mental health, suspecting that her anxiety was not well controlled. While the appellant was waiting at the mental health clinic, a social worker also noted that the appellant was shaking, and a mental health technician noticed the appellant's pinpointed pupils. Medical personnel informed the legal office of their suspicions, which resulted in a Security Forces investigation. That same day a military magistrate at Keesler AFB authorized a search of the appellant's urine, which subsequently tested positive for the metabolites of cocaine and oxycodone.

At trial, the appellant challenged whether probable cause existed for the search. On appeal, she does not challenge the basis for the probable cause determination. However, she alleges that her trial defense counsel were ineffective for failing to seek suppression of the urinalysis evidence for another reason. Specifically, she alleges that the written search authorization only allowed the government to "seize" her urine, not "search" it.

■ We review claims of ineffective assistance of counsel de novo, applying the two-pronged test the Supreme Court set forth in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). *See United States v. Tippit,* 65 M.J. 69, 76 (C.A.A.F.2007). Under *Strickland,* an appellant must demonstrate:

(1) a deficiency in counsel's performance that is "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment"; and (2) that the deficient performance prejudiced the defense through errors "so seri-

on 2 May 2006, the day she entered active duty.

ous as to deprive the defendant of a fair trial, a trial whose result is reliable."

*Tippit,* 65 M.J. at 76 (quoting *United States v. Moulton,* 47 M.J. 227, 229 (C.A.A.F.1997) (quoting *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052)). When an appellant alleges ineffective assistance of counsel, he "must surmount a very high hurdle." *Id.* (citations omitted). The deficiency prong requires that an appellant show that the performance of counsel fell below an objective standard of reasonableness, according to the prevailing standards of the profession. *Strickland,* 466 U.S. at 688, 104 S.Ct. 2052. The prejudice prong requires a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052.

In response to an order from this Court, the appellant's military and civilian trial defense attorneys submitted affidavits explaining their rationale for not raising a motion to suppress based on the wording of the search authorization. Both stated they believed they had no good faith basis to file such a motion because the search authorization was aimed at evidence of the appellant's wrongful drug use, and it would have been illogical to think that the magistrate intended the urine to be seized but not searched. They also noted that in this judge-alone trial, they wanted to focus their efforts on motions they believed had more merit to build credibility with the military judge.

Under these circumstances, we find that trial defense counsel did not demonstrate deficiencies "so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Tippit,* 65 M.J. at 76 (citations omitted). Trial defense counsel advocated vigorously for their client, securing an acquittal on one drug use specification and a sentence to confinement that was half of that requested by the Government. On the issue of the search authorization, the Air Force Form 1176, *Authority to Search and Seize,* (1 June 1988), did authorize only the "seizure" of the urine, but it also authorized a "search" of the appellant, and based on the affidavit by the investigator and the testimony of both the investi-

gator and the military magistrate, everyone involved in the issuance of the search authorization envisioned that the purpose was not only to obtain the appellant's urine but to test it as well. However, if the military judge found the language of the authorization did not encompass a search of the appellant's urine, it is likely that the military judge would have applied either the good faith or the inevitable discovery exceptions to the search authorization requirement, rendering any efforts by trial defense counsel to suppress the evidence inconsequential. We find that this matter does not rise to the level of ineffective assistance of counsel, especially considering the fact that trial defense counsel did move to suppress the results of the urinalysis on another basis.

### Confrontation Clause

■■■ The appellant's final assertion of error claims that her right to confrontation under the Sixth Amendment[7] was violated when the Government's drug testing expert testified that she knew the appellant's specimen bottle contained the urine specimen that was tested and referred to throughout the drug testing report. We disagree.

■■■ The antecedent question of whether admitted evidence constitutes testimonial hearsay is a question of law we review do novo. *United States v. Blazier,* 68 M.J. 439, 442 (C.A.A.F.2010) (citations omitted). However, a military judge's decision to admit evidence in the absence of a defense objection will be upheld absent plain error. *See United States v. Sweeney,* 70 M.J. 296, 303–04 (C.A.A.F.2011). Under plain error review, relief is only appropriate where (1) there was error, (2) the error was plain and obvious, and (3) the error materially prejudiced a substantial right of the accused. *Id.* at 304 (citations omitted).

■■■ A statement is testimonial if it is "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Sweeney,* 70 M.J. at 301 (quoting *Blazier,* 68 M.J. at 442). "Asked another way," the test is "would it be reason-

7. U.S. Const. amend. VI.

ably foreseeable to an objective person that the purpose of any individual statement in a drug testing report is evidentiary?" *Id.* at 302. "To make this determination, [military courts are charged with treating] 'fine distinctions based on the impetus behind the testing and the knowledge of those conducting laboratory tests at different points in time' as relevant considerations, but not as dispositive factors." *United States v. Tearman*, 72 M.J. 54, 58 (C.A.A.F.2013) (quoting *Blazier*, 68 M.J. at 442).

At trial, upon defense motion, the military judge in this judge-alone trial ruled that he would not consider the internal chain-of-custody documents included in the drug testing report, citing concerns that they contained testimonial hearsay. After a comment by trial counsel, the military judge noted that the Government's expert "can certainly rely on the chain of custody in order to render an opinion, but I will not consider anything in this drug testing report that is not machine-generated." Following this ruling, the Government's expert testified as follows:

Q: Can you please tell us what that is?

A: This is another urine specimen collection bottle.

Q: And how does that bottle relate to the report you just mentioned?

A: This is the bottle for the specimen in this report.

Q: And how do you know that?

A: I know it by matching up the laboratory accession number from the bottle to the chain of custody, page 1 of this report. In addition, there is other identification related to the base, the collection date, and the social security number that is also found on that chain.

The appellant did not object to this testimony at trial, but now on appeal, she asserts that this testimony merely "parroted" the statements in the drug testing report that the military judge found constituted testimonial hearsay, thereby violating her right to confrontation. We disagree. It is immaterial that the Government expert relied in part on the chain-of-custody documents to support her conclusion that the specimen introduced at trial was the specimen referred to in the drug testing report. Her testimony may have referred to the documents that she used to reach her conclusion, but it did not disclose the contents of the documents and therefore did not disclose any testimonial hearsay to the factfinder. Moreover, even if the Government expert did "parrot" the contents of the internal chain-of-custody documents to the factfinder, this would not be error. Our superior court recently held that internal chain-of-custody documents and internal review worksheets contained within a drug testing report are not testimonial hearsay for purposes of the Confrontation Clause. *Tearman*, 72 M.J. at 61. Therefore, the military judge could have considered the chain-of-custody documents outright without violating the appellant's rights. The military judge committed no error, let alone plain error, by failing to sua sponte exclude this testimony.

*Conclusion*

The approved findings and sentence are correct in law and fact, and no error prejudicial to the substantial rights of the appellant occurred.[8] Articles 59(a) and 66(c), UCMJ, 10 U.S.C. §§ 859(a), 866(c). Accordingly, the findings and sentence are

AFFIRMED.

---

8. Though not raised as an issue on appeal, we note that the overall delay of more than 540 days between the time of docketing and review by this Court is facially unreasonable. *United States v. Moreno*, 63 M.J. 129, 142 (C.A.A.F.2006). Having considered the totality of the circumstances and the entire record, we find that the appellate delay in this case was harmless beyond a reason-

able doubt. *Id.* at 135–36 (reviewing claims of post-trial and appellate delay using the four-factor analysis found in *Barker v. Wingo*, 407 U.S. 514, 530, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972)). Moreover, we find that the delay in this case does not render the appellant's sentence inappropriate under Article 66(c), UCMJ. *See United States v. Tardif*, 57 M.J. 219, 224 (C.A.A.F.2002).