UNITED STATES, Appellee

v.

Joshua C. BLAZIER, Senior Airman
U.S. Air Force, Appellant

No. 09-0441

Crim. App. No. 36988

United States Court of Appeals for the Armed Forces

Argued January 26, 2010

Decided March 23, 2010

RYAN, J., delivered the opinion of the Court, in which EFFRON,
C.J., and BAKER, ERDMANN, and STUCKY, JJ., joined.


Counsel

For Appellant:  Captain Marla J. Gillman (argued); Colonel James
B. Roan and Major Shannon A. Bennett (on brief); Lieutenant
Colonel Maria A. Fried and Major Lance J. Wood.

For Appellee:  Gerald R. Bruce, Esq. (argued); Colonel Douglas
P. Cordova and Lieutenant Colonel Jeremy S. Weber (on brief);
Major Coretta E. Gray.


Military Judge:  Joseph S. Kiefer


THIS OPINION IS SUBJECT TO REVISION BEFORE FINAL PUBLICATION.

United States v. Blazier, No. 09-0441/AF

Judge RYAN delivered the opinion of the Court.

Appellant was convicted, contrary to his pleas, of dereliction of duty and wrongful use of controlled substances, in violation of Articles 92 and 112a, Uniform Code of Military Justice (UCMJ), 10 U.S.C. §§ 892, 912a (2006).  The members sentenced him to a bad-conduct discharge, forty-five days of confinement, and reduction to the grade of E-3.  The convening authority approved the adjudged sentence.

This case presents the question whether the admission of "drug testing reports" over defense objection violated Appellant's rights under the Sixth Amendment's Confrontation Clause.[1]  The antecedent question, whether certain admitted evidence was testimonial, we answer affirmatively, and contrary to the decision of the United States Air Force Court of Criminal Appeals (CCA), United States v. Blazier, 68 M.J. 544 (A.F. Ct. Crim. App. 2008).  The disposition of the case, however, presents issues neither considered by this Court before nor

---

[1] We granted review of the following issue:

> WHETHER, IN LIGHT OF CRAWFORD v. WASHINGTON, 541 U.S. 36 (2004), APPELLANT WAS DENIED MEANINGFUL CROSS-EXAMINATION OF GOVERNMENT WITNESSES IN VIOLATION OF HIS SIXTH AMENDMENT RIGHT OF CONFRONTATION WHEN THE MILITARY JUDGE DID NOT COMPEL THE GOVERNMENT TO PRODUCE ESSENTIAL BROOKS LAB OFFICIALS WHO HANDLED APPELLANT'S URINE SAMPLES AND INSTEAD ALLOWED THE EXPERT TOXICOLOGIST TO TESTIFY TO NON-ADMISSIBLE HEARSAY.  SEE MELENDEZ-DIAZ v. MASSACHUSETTS, 557 U.S. ___, 129 S. CT. 2527 (2009).

addressed by the parties.  Having resolved the threshold

question, and given the ubiquity of drug testing within the

military, we conclude that additional briefing is warranted

prior to final disposition of the case.

I.

Appellant provided a urine sample for random urinalysis

pursuant to the Air Force Drug Testing Program on June 5, 2006

(June test).  This sample was tested at the Air Force Institute

for Operational Health, Drug Testing Division, also known as the

"Brooks Lab."  The sample tested positive for d-amphetamine, d-

methamphetamine, methylenedioxyamphetamine, and

methylenedioxymethamphetamine at concentrations above the

Department of Defense (DoD) cutoff level.  In early July 2006,

the results were forwarded to Appellant's command.

As a result, the Air Force Office of Special Investigations

(AFOSI) Detachment at Luke Air Force Base requested that

Appellant's First Sergeant "bring [Appellant] over" for an

interview; this interview was conducted on July 10.  Appellant

denied knowingly ingesting illegal substances.  The AFOSI agents

then asked Appellant if he would consent to providing another

urine sample, which he agreed to do.  This sample (July test)

was also sent to the Brooks Lab, where it was tested later in

July; it tested positive for THC, a metabolite of marijuana, at

a concentration above the DoD cutoff level.  The positive result

3

was transmitted to Appellant's command.

On August 15, 2006, the military justice paralegal from Appellant's command sent a memorandum to the Brooks Lab requesting "the drug testing reports and specimen bottles" for the two urine samples, noting that the information was "needed for court-martial use."

The "drug testing reports" requested are multipage documents. Each report includes: (a) a cover memorandum describing and summarizing both the tests the urine samples were subjected to and the illegal substances discovered; and (b) attached records, including, inter alia, raw, computer-generated data; chain-of-custody documents; and occasional handwritten annotations. The cover memorandum for each drug testing report is stamped "AUG 16 2006" at the top and states, among other things: "The specimen was determined to be presumptive positive by the 'screen' and the 'rescreen' immunoassay procedures. The specimen was then confirmed positive by Gas Chromatography/Mass Spectrometry (GC/MS)." Each memorandum then lists the concentrations of the specimens tested and the corresponding DoD cutoff levels, followed by the signature of a "Results Reporting Assistant, Drug Testing Division": Marina Jaramillo for the June test, Andrea P. Lee for the July test.[2] The bottom portion of each memorandum is a signed and sworn declaration by Dr.

---

[2] Neither individual testified at trial.

Vincent Papa, the "Laboratory Certifying Official," confirming the authenticity of the attached records and stating that they were "made and kept in the course of the regular conducted activity" at the Brooks Lab.  For the June test, Dr. Papa's declaration was executed on August 17, 2006; for the July test, it was executed on August 16, 2006.

Prior to trial, civilian defense counsel filed a motion requesting that the military judge either (a) preclude the Government from presenting the drug testing reports and from calling its forensic toxicologist (Dr. Papa himself) to provide expert testimony about urinalysis screenings at the Brooks Lab, or (b) in the alternative, compel the Government to produce the laboratory personnel "who had the most important actions involved in the samples."  The defense did not specify which personnel needed to be produced.

Trial counsel introduced Dr. Papa for testimony on the motion.  As a forensic toxicologist and laboratory certifying official, Dr. Papa stated his job at the lab was to "certify data for both positive and negative tests for scientific and forensic reliability."  Dr. Papa certified the authenticity and "business-record" nature of the records attached to the drug testing report cover memoranda and reviewed the bottle label for the June test sample, but he did not otherwise personally

observe either the testing or reviews of Appellant's samples.[3]

He testified about testing procedures at the Brooks Lab, explained some of the documents included in the drug testing reports, and stated that the purpose of the lab was "[t]o produce forensically defensible results for the military to use in legal proceedings."

The military judge denied the defense's motion, concluding that the statements in the drug testing reports were nontestimonial under Crawford v. Washington, 541 U.S. 36 (2004), and United States v. Magyari, 63 M.J. 123 (C.A.A.F. 2006). Regarding the June test, the military judge stated that personnel at the Brooks Lab did not associate the sample with a particular individual and that the sample, collected in the course of a random urinalysis, was not processed in furtherance of a particular law enforcement investigation; thus it was not testimonial.

Regarding the July test, which was obtained by consent, the military judge determined that the request for consent on July 10, 2006, was "more akin to a shot in the dark than pursuit of a specific law enforcement objective."  He reasoned that while AFOSI "may have generally suspected that the accused was

---

[3] Dr. Papa also testified at the trial itself, "as an expert in the field of pharmacology area of drug testing and forensic toxicology."  His testimony at trial was similar to that on motion, but more detailed.  No one else from the lab testified.

involved in drug use, they likely did not have sufficient cause to obtain a search authorization on 10 July," and that "the character of a consent urinalysis is different from a probable cause authorization."  The military judge held that both drug testing reports were nontestimonial hearsay admissible under the business records exception, Military Rule of Evidence (M.R.E.) 803(6).  The CCA affirmed.  Blazier, 68 M.J. at 546.

## II.

The Confrontation Clause of the Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him . . . ."  U.S. Const. amend VI.  This gives defendants the right to question not only witnesses providing oral, in-court testimony, but also the declarant of any hearsay that is "testimonial."  Crawford, 541 U.S. at 50-52.[4]  Before such testimonial hearsay may be admitted, the Confrontation Clause

---

[4] The Supreme Court in Crawford provided a non-exclusive list of examples of what constitutes "testimonial" hearsay:  (1) "ex parte in-court testimony or its functional equivalent -- that is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially"; (2) "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions"; and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."  541 U.S. at 51-52 (citations and quotation marks omitted).

requires that the accused have been afforded a prior opportunity to cross-examine the witness and that the witness be unavailable. Id. at 53-54, 68.

In this case, the military judge admitted two complete "drug testing reports" on the ground that they were not testimonial and therefore not subject to the requirements of Crawford. While this Court reviews a military judge's decision to admit or exclude evidence for an abuse of discretion, United States v. Clayton, 67 M.J. 283, 286 (C.A.A.F. 2009), the antecedent question here -- whether evidence that was admitted constitutes testimonial hearsay -- is a question of law reviewed de novo. Id.

In attempting to answer that question, the military judge, the parties, and the CCA focused on the impetus behind the June and July urinalyses and, relatedly, the subjective expectations of those conducting the various tests. But while fine distinctions based on the impetus behind the testing and the knowledge of those conducting laboratory tests at different points in time are relevant in determining whether a "statement" was "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," Crawford, 541 U.S. at 51-52 (citations and quotation marks omitted), that does not end the inquiry here. The Court considered those facts dispositive in

8

Magyari and United States v. Harcrow, 66 M.J. 154 (C.A.A.F. 2008), but the circumstances of this case are different from the circumstances in those cases.

In Magyari, the focus was on "whether the data entries in Appellant's urinalysis lab report made by the Navy Drug Screening Laboratory technicians," resulting from a random, non-investigative urinalysis screening, were "testimonial," and concluded that such entries were not testimonial when such samples are not equated with particular individuals. Magyari, 63 M.J. at 125-26. The Court reasoned that "[b]ecause the lab technicians were merely cataloging the results of routine tests, the technicians could not reasonably expect their data entries would 'bear testimony' against [the] Appellant at his court-martial." Id. at 127 (citation omitted). Harcrow involved laboratory reports generated from evidence seized during arrest. 66 M.J. at 158-59. The Court concluded that the reports were testimonial because they were completed at the behest of the sheriff's office, pertained to items seized from the accused's home at the time of arrest, and expressly identified the accused as "a 'suspect.'" Id. Each case depended on its specific facts. See Harcrow, 66 M.J. at 159; Magyari, 63 M.J. at 127. But whatever the rationale for conducting the urinalyses or the

subjective belief of the testers in this case,[5] the drug testing report cover memoranda of August 16 for both the June and July tests are themselves testimonial.

When the Government requested both drug testing reports on August 15, 2006, it explicitly stated that the information was "needed for court-martial use."  The cover memorandum analyzing and summarizing the contents of each report cannot be analyzed under, or by analogy to, the facts in Magyari.[6]  Cf. Harcrow, 66 M.J. at 159 ("[I]n reaching our conclusion in Magyari, we rejected the government's argument that laboratory reports will always be nontestimonial . . . ."); Magyari, 63 M.J. at 127 ("[T]he same types of records may also be prepared at the behest of law enforcement in anticipation of a prosecution, which may make the reports testimonial.").  For while the drug tests themselves occurred in June and July, the top portion of the cover memorandum of each report -- dated "AUG 16 2006,"

---

[5] We note that despite the fact that Appellant was under investigation when the consent urinalysis was obtained, both the military judge and the CCA focused on whether there was sufficient evidence of drug use to obtain a probable cause urinalysis.  But whether there was probable cause is not the test, because Appellant was surely under investigation.  As we recently emphasized, "'lab results or other types of routine records may become testimonial where a defendant is already under investigation, and where the testing is initiated by the prosecution to discover incriminating evidence.'"  Harcrow, 66 M.J. at 159 (quoting Magyari, 63 M.J. at 127).

[6] We need not address, at this point, the application of Crawford or Magyari to the other documents.

detailing the tests taken and summarizing the results -- was prepared not only after the results reporting assistant knew that the specimens had tested positive for illegal substances, but also in response to the prior day's request by Appellant's command for such reports "for court-martial use."

Given these circumstances, the top portions of the drug testing report cover memoranda -- which summarize and clearly set forth the "accusation" that certain substances were confirmed present in Appellant's urine at concentrations above the DOD cutoff level -- are clearly testimonial.

This is evident in light of Melendez-Diaz v. Massachusetts, 129 S. Ct. 2527 (2009). For while not exactly the same, the top portions of the drug testing report cover memoranda at issue here at least resemble the "drug certificates" at issue in Melendez-Diaz, 129 S. Ct. at 2532-33 (holding that, under a "rather straightforward application of our holding in Crawford," drug analyst affidavits were testimonial). There, drugs were seized pursuant to an arrest and "certificates of analysis" were admitted at trial "pursuant to state law as 'prima facie evidence of the composition, quality, and the net weight of the narcotic . . . analyzed.'" Id. at 2530-31 (omission in original; citation omitted). Noting that "under Massachusetts law the sole purpose of the affidavits was to provide 'prima facie evidence of the composition, quality, and the net weight'

11

of the analyzed substance," the Supreme Court stated that "[w]e can safely assume that the analysts were aware of the affidavits' evidentiary purpose, since that purpose -- as stated in the relevant state-law provision -- was reprinted on the affidavits themselves."  Id. at 2532.

Similar to the sworn certificates of analysis in Melendez-Diaz, the top portion of the drug testing report cover memoranda in this case identify the presence of an illegal drug and indicate the quantity present.  And the evidentiary purpose of those memoranda was apparent, as they not only summarize and digest voluminous data but were generated in direct response to a request from the command indicating they were needed for use at court-martial.  This is true regardless of the impetus behind the testing, the knowledge of those conducting laboratory tests at different points in time, or whether the individual underlying documents are themselves testimonial.

In another respect, however, the cases are distinct.  In Melendez-Diaz, the certificates were introduced as evidence without more:  no one was subject to cross-examination about the testing, procedures, or quality control, for example, with respect to the results upon which the certificates were based.

12

See id. at 2531.[7]  Here, while Dr. Papa did not personally perform or observe the testing (other than reviewing the bottle label for the first sample) or author the cover memoranda, he was the certifying official for the drug testing reports and was recognized as an expert in "the field of pharmacology area of drug testing and forensic toxicology," without defense objection.  Neither party has addressed the relevance of these facts to the disposition of this case.

### III.

Given the ubiquity of drug testing within the military, and absent extraordinary circumstances not present here, the better course is for this Court to seek the views of the parties and permit them to advance their arguments, rather than to address these issues sua sponte.  Cf. Greenlaw v. United States, 128 S. Ct. 2559, 2564 (2008) (noting that "'[o]ur adversary system is designed around the premise that the parties . . . are responsible for advancing the facts and arguments entitling them to relief'" (quoting Castro v. United States, 540 U.S. 375, 381-83 (2003) (Scalia, J., concurring in part and concurring in the judgment))).

Thus, while we hold that at least the top portion of the drug testing report cover memoranda of August 16 for both the

---

[7] We note that the Supreme Court has stated that not "everyone who laid hands on the evidence must be called." Melendez-Diaz, 129 S. Ct. at 2532 n.1.

13

June and July tests -- signed by the results reporting

assistants -- were testimonial, we order briefing from the

parties, and invite briefing from the government and defense

appellate divisions from the other services, on the following:

   While the record establishes that the drug testing reports,
as introduced into evidence by the prosecution, contained
testimonial evidence (the cover memoranda of August 16), and the
defense did not have the opportunity at trial to cross-examine
the declarants of such testimonial evidence,

   (a)  was the Confrontation Clause nevertheless satisfied by
testimony from Dr. Papa?  See, e.g., Pendergrass v. Indiana, 913
N.E.2d 703, 707-08 (Ind. 2009).  But see, e.g., State v.
Locklear, 681 S.E.2d 293, 304-05 (N.C. 2009); or

   (b)  if Dr. Papa's testimony did not itself satisfy the
Confrontation Clause, was the introduction of testimonial
evidence nevertheless harmless beyond a reasonable doubt under
the circumstances of this case if he was qualified as, and
testified as, an expert under M.R.E. 703 (noting that "[i]f of a
type reasonably relied upon by experts in the particular field
in forming opinions or inferences upon the subject, the facts or
data [upon which the expert relied] need not be admissible in
evidence in order for the opinion or inference to be admitted")?
Compare, e.g., United States v. Turner 591 F.3d 928, 933-34 (7th
Cir. 2010), and United States v. Moon, 512 F.3d 359, 362 (7th
Cir. 2008), with United States v. Mejia, 545 F.3d 179, 197-98
(2d Cir. 2008).

   Appellant will file a brief on the above issues no later

than thirty days after the date of this opinion.  Appellee will

file a brief no later than thirty days after the filing of

Appellant's brief.  Appellant may file a reply no later than ten

days after the filing of Appellee's brief.  If the government

and defense appellate divisions of the other services file

amicus curiae briefs on the above issues in support of a party,

such briefs may be filed no later than ten days after that party has filed its brief.  Pending receipt of the briefs, the case will remain on the docket for final decision.