**UNITED STATES**

v.

**Airman Basic Joshua KATSO,**
**United States Air Force**

**ACM 38005**

U.S. Air Force Court of Criminal Appeals.

11 April 2014

Sentence adjudged 6 May 2011 by GCM convened at Grand Forks Air Force Base, North Dakota.

Appellate Counsel for the appellant: Major Zaven T. Saroyan and Captain Travis K. Ausland.

. Appellate Counsel for the United States: Colonel Don M. Christensen; Lieutenant Colonel C. Taylor Smith; Major Tyson D. Kindness; and Gerald R. Bruce, Esquire.

Before ROAN, ORR, and MARKSTEINER Appellate Military Judges

### OPINION OF THE COURT .

ROAN, Chief Judge:

The appellant was convicted, contrary to his pleas, by a general court-martial composed of officer and enlisted members of one specification of aggravated sexual assault, one specification of burglary, and one specification of unlawful entry in violation of Articles 120, 129, and 134, UCMJ, 10 U.S.C. §§ 920, 929, 934. The adjudged and approved sentence consisted of a dishonorable discharge, 10 years of confinement, and forfeiture of all pay and allowances. The appellant raises two issues for our consideration: (1) Whether the appellant's right to confrontation was denied when the military judged overruled a defense objection to the testimony of the Government's DNA expert, and (2) Whether the appellant's conviction for unlawful entry should be dismissed because the

specification failed to state the terminal element.[1] For the reasons discussed below, we find the surrogate expert improperly repeated testimonial hearsay and that the error was not harmless beyond a reasonable doubt.

### Background

While celebrating her 21st birthday with several friends, Senior Airman (SrA) CA became intoxicated after consuming between 15 and 20 drinks over the course of the evening. At an off-base bar and unable to return to the base on her own, she was assisted back to her room and fell asleep on her bed. SrA CA testified that she woke up when she felt "someone having sex with [her]." She said she was attacked by someone wearing denim pants, glasses, a beanie cap, and a coat. After SrA CA struggled against him, her assailant left, and SrA CA ran into another room and told a friend she had been raped. SrA CA subsequently identified the appellant as her attacker.

Agents of the local Air Force Office of Special Investigations (AFOSI) responded and collected blood and DNA samples from SrA CA and the appellant. The evidence was sent to the United States Army Criminal Investigations Laboratory (USACIL) for analysis. Mr. Fisher, a USACIL forensic DNA examiner, examined the samples and produced a report reflecting a match between the appellant's DNA profile and semen retrieved from SrA CA during the sexual assault examination. In accordance with USACIL's standard operating procedures, a second DNA examiner, Mr. Davenport, conducted a technical review to verify Mr. Fisher's findings.

Shortly before trial, Mr. Fisher informed the Government that he would not be available to testify due to a family emergency. The Government sought to have Mr. Davenport testify in place of Mr. Fisher. Defense counsel objected to

Mr. Davenport's testimony, arguing the appellant's right to confront Mr. Fisher, the witness who had performed key steps in the DNA analysis that was to be used against him at trial, would be violated.

---

1. Senior Judge Orr took part in this opinion prior to his retirement.

During both the motion hearing and before the members, Mr. Davenport explained the process for analyzing and interpreting DNA samples, which is summarized below:

1. Evidence is sent by investigators to USACIL in a double-wrapped box. Included with the sealed box are the shipping documents and any documents sent by AFOSI, including chain of custody information, the request for DNA examination, and in some cases, statements pertinent to the case.

2. The evidence processing section scans the documents into the laboratory's document management system to create a case file which is then viewable by all technicians involved with the case. The sealed box containing the physical evidence is logged into the evidence processing section.

3. The case file is sent to the DNA analysis branch and a DNA examiner is randomly assigned to conduct the DNA testing.

4. The DNA examiner checks the physical evidence box out from the evidence processing section.

5. The DNA examiner opens the evidence box, examines the inventory, and looks at the tag numbers and chain of custody documents to verify the laboratory has received everything that is listed as having been sent by investigators.

6. When the evidence has been collected during a sexual assault examination, the DNA examiner conducts a visual serology examination to determine if semen is on the items associated with the case. This serology determination involves three presumptive tests performed on a portion of the swab:

   a. The DNA examiner applies a chemical agent to the sample and looks for a particular change in color;

   b. The DNA examiner conducts a microscopic evaluation, looking for the presence of sperm cells; and

   c. The DNA examiner applies a chemical liquid to the sample and places that liquid in a "test cassette" which will then show either a positive or negative result.

   d. The DNA examiner also runs a positive and negative control for each chemical used in the process. He also records the lot numbers of the chemicals to ensure they are not expired.

7. If semen is found, the evidentiary item will be sent for DNA analysis, as will the known samples taken from the victim and any suspect, in order to generate DNA profiles for comparison purposes. To ensure quality control, the examiner creates a profile from a known DNA sample from the laboratory and runs a blank reagent (which should yield no DNA profile). The DNA analysis process involves four steps for each sample, performed by the DNA examiner using machines within the laboratory:

   a. Purifying the DNA;

   b. Determining the quantity of DNA present by using a kit that creates a computer printout of the results;

   c. Making "copies" of certain areas of the DNA; and

   d. Generating a DNA profile by using a machine which creates computer files consisting of raw data.

8. The raw data generated in step 7d above is run through a computer program which assigns certain numbers to the DNA profile and creates an image with peaks reflecting those numbers. If a male DNA profile is found on the questioned sample, the DNA examiner "interprets" the evidence by comparing the DNA profile from the questioned samples with the DNA profile found in the suspect's known profile swabs. If there is a match, the examiner conducts a statistical frequency calculation.

9. The statistical determination is created by comparing the male DNA profile found on the victim's swab to the DNA profiles in the FBI database to determine how common or rare the profiles are. Using this database, the DNA examiner calculates the "statistical frequency," namely the frequency that

genetic match will be found within the population.

10. The DNA examiner writes a report containing the results of the testing and analysis, including the serology findings, the DNA findings, and the frequency statistic.

11. The report goes through a two-step review process before it is published: a technical review and an administrative review.

    a. The technical review is performed by another qualified DNA examiner at the laboratory. The reviewer looks at the case file which contains information about the evidence from its arrival in evidence through the creation of the report, including the notes of the initial examiner. In conducting this review, he does not re-accomplish the work done in steps 3–7 by the initial examiner. Instead, he checks to see if that examiner's notes show that proper testing protocol was followed and that his notes match his report. The reviewer does repeat the work done by the initial examiner in steps 8 and 9 by running the raw data computer files created in step 7d through the computer program to reach his own conclusions about the evidence. If they match the results of the initial examiner, the technical reviewer will sign off on the initial examiner's report.

    b. The administrative review is performed to check for typographical errors and to ensure all pages of the report are present.

12. The report is published and returned to the law enforcement agency that requested the test.

Mr. Davenport stated the process used by USACIL has proven reliable and has gained widespread acceptance in the scientific community.

Mr. Davenport testified that during his technical review of Mr. Fisher's report, he examined the case file and reviewed the documents submitted by AFOSI to ensure the tag numbers were properly reflected on the report confirming that evidence in fact came into the laboratory and was properly documented. He also examined the report to ensure all steps of the testing process were conducted and recorded, the positive and negative controls were tested, and the lot numbers were written down. As part of the technical review, Mr. Davenport testified that although he did not reconstruct the DNA profiles previously developed by Mr. Fisher (as described in steps 1 through 7 above), he did examine the raw data that was created during the generation of the DNA profile by running the information through a computer program to produce a statistical frequency determination. He personally interpreted the data to determine whether the DNA profiles matched and then compared his findings with those of the original analyst to verify the results. This same process was repeated for all known samples and submitted items of evidence. Following this, Mr. Davenport concluded the semen found on the swabs taken from the victim in this case contained the appellant's DNA profile.

After argument, the military judge denied the defense's motion, finding Mr. Davenport could testify concerning his independent findings without violating the Confrontation Clause. This included providing his independent opinion about the reliability of the testing procedures used, the findings and results, and the frequency statistics related to those findings and results.

Before the members, Mr. Davenport testified that he independently determined: (1) The evidentiary items were received and analyzed in accordance with established USACIL and DNA testing protocol; (2) The vaginal swabs, rectal swabs, and debris collection swabs obtained from the victim contained semen; (3) The appellant's DNA profile matched the DNA profile obtained from the victim's rectal swabs; (4) Male DNA was present on the victim's vaginal swabs; and (5) A mixture of DNA profiles from the victim and appellant were obtained from the penile head swabs, penile shaft swabs, and the scrotum swab. Mr. Davenport also testified as to the statistical frequency associated with the DNA profiles. The DNA report itself was not admitted into evidence.

*Law of Confrontation*

The appellant argues on appeal that his right to confrontation was violated when the substitute analyst, Mr. Davenport, was permitted to testify in place of Mr. Fisher, the original analyst, concerning the DNA findings. Specifically, the appellant contends Mr. Davenport repeated inadmissible testimonial hearsay to the members that should have been excluded pursuant to *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004), and its progeny.

The Sixth Amendment[2] provides that "[i]n all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." Therefore, "no testimonial hearsay may be admitted against a criminal defendant unless (1) the witness is unavailable, and (2) the witness was subject to prior cross-examination." *United States v. Blazier*, 69 M.J. 218, 222 (C.A.A.F.2010) [hereinafter *Blazier II* ] (citing *Crawford*, 541 U.S. at 53–54, 124 S.Ct. 1354). We review a military judge's decision to admit or exclude evidence for an abuse of discretion. *United States v. Manns*, 54 M.J. 164, 166 (C.A.A.F.2000). Whether admitted evidence constitutes testimonial hearsay is a question of law we review de novo. *United States v. Blazier*, 68 M.J. 439, 442 (C.A.A.F.2010)[hereinafter *Blazier I* ].

After a complete review of the record of trial and briefs from both parties, we conclude Mr. Davenport improperly repeated testimonial hearsay from Mr. Fisher and the appellant's right to confrontation was violated. We further find the error was not harmless beyond a reasonable doubt.

In *United States v. Sweeney*, 70 M.J. 296, 301 (C.A.A.F.2011), the Court of Appeals for the Armed Forces reiterated its holding in *Blazier I* that "a statement is testimonial if 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" (quoting *Blazier I*, 68 M.J. at 442). Thus, "[a] document created solely for an evidentiary purpose ... made in aid of a police investigation, ranks as testimonial." *Id.* (citing *Bullcoming v. New Mexico*, —— U.S. ——, 131 S.Ct. 2705, 2717, 180 L.Ed.2d 610 (2011) (alterations in original)). The court declared "the focus has to be on the purpose of the *statements* in the drug testing report itself, rather than the initial purpose for the urine being collected and sent to the laboratory for testing." *Id.* at 302 (emphasis in original). The court noted that although those performing initial drug tests may well be " 'independent scientist[s]' carrying out 'non-adversarial public dut[ies],' that does not mean that their statements are not produced to serve as evidence." *Id.* (alterations in original).

In *United States v. Tearman*, 72 M.J. 54, 58 (C.A.A.F.2013) our superior court, while still applying the test from *Sweeney*, recognized that the current state of the law for determining when a particular statement is classified as testimonial is unclear and "far from fixed."[3] In his partial concurrence,

---

2. U.S. Const. amend. VI.

3. The Court detailed the many tests that various Supreme Court Justices have applied in determining whether a statement is testimonial:

Compare *Bullcoming*, 131 S.Ct. at 2714 n. 6 (plurality opinion) ("To rank as 'testimonial,' a statement must have 'a primary purpose' of 'establish[ing] or prov[ing] past events potentially relevant to later criminal prosecution.'" (alterations in original) (quoting *Davis* [*v. Washington* ], 547 U.S. [813] at 822, 126 S.Ct. 2266 [165 L.Ed.2d 224 (2006) ])), with *Melendez–Diaz*, 557 U.S. at 311, 129 S.Ct. 2527 ("Here ... the affidavits [were] 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial' ...." (quoting *Crawford*, 541 U.S. at 52, 124 S.Ct. 1354)), *and Melendez–Diaz*, 557 U.S. at 329, 129 S.Ct. 2527 (Thomas, J., concurring) ("I continue to adhere to my position that 'the Confrontation Clause is implicated by extrajudicial statements only insofar as they are contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions.'" (quoting *White v. Illinois*, 502 U.S. 346, 365, 112 S.Ct. 736, 116 L.Ed.2d 848 (1992) (Thomas, J., concurring in part and concurring in the judgment))), *and Davis*, 547 U.S. at 826–28, 126 S.Ct. 2266 (distinguishing "interrogations solely directed at establishing the facts of a past crime"—which elicit testimonial statements—from interrogations designed to enable law enforcement "to meet an ongoing emergency"—which do not), *and Crawford*, 541 U.S. at 51, 124 S.Ct. 1354 (offering one formulation of testimonial statements as " 'material such as affidavits, custodial ex-

Chief Judge Baker questioned whether *Sweeney* is still viable in light of the Supreme Court's decision in *Williams v. Illinois,* ——— U.S. ———, 132 S.Ct. 2221, 183 L.Ed.2d 89 (2012), stating, "*Williams* considerably narrows the Supreme Court's previous language, previously adopted by this Court, that 'a statement is testimonial if "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." ' " *Tearman,* 72 M.J. at 68 n. 7 (Baker, C.J., concurring in part and in the result) (quoting *Crawford,* 541 U.S. at 51–52, 124 S.Ct. 1354).

In order to determine whether *Sweeney* is still valid, it is necessary to review the *Williams* case in some detail. In *Williams,* the Supreme Court delivered a highly fractured opinion concerning whether a DNA report created by an independent lab was testimonial and if so, was it nevertheless admissible over a Confrontation Clause objection. Vaginal swabs from a rape victim were sent to Cellmark, a private laboratory, for DNA analysis. Cellmark analysts produced a report indicating male DNA was present from the victim's swabs. These results were then sent to the state laboratory to create a profile. At this time, the alleged rapist's identity was not known. Several months later, a state laboratory created a DNA profile from Williams following his arrest on unrelated charges and placed it in a state database. At trial, a state forensic expert who was not involved in the Cellmark testing testified that she matched the DNA profile produced by Cellmark with Williams' DNA profile maintained in the state database. The state did not call any witness from Cellmark to testify and did not offer any direct evidence that Cellmark technicians had followed proper procedures while analyzing the DNA so that Williams' DNA profile was actually derived from the semen on the victim's swab. *Id.* at 2230. Williams objected to the expert's testimony, arguing it violated his right to confrontation because the expert witness did not have personal knowledge that the profile produced by Cellmark was based on vaginal swabs taken from the victim. *Id.* at 2231.

Justice Alito wrote for a four-judge plurality and concluded the Confrontation Clause did not preclude the introduction of the state expert's testimony for two reasons. First, the plurality stated that the Confrontation Clause does not apply to "out-of-court statements that are not offered to prove the truth of the matter asserted." *Id.* at 2228. The plurality concluded that the expert's testimony that DNA "found in semen from the vaginal swabs of [the victim]" was not used for the purpose of proving the truth of the matter asserted. *Id.* at 2236. Rather, it served as the premise of the prosecutor's question. The plurality declared, "There is no reason to think that the trier of fact [the trial judge] took [the expert's] answer as substantive evidence to establish where the DNA profiles came from." *Id.* Justice Alito noted, "It has long been accepted that an expert witness may voice an opinion based on facts concerning the events at issue in a particular case even if the expert lacks firsthand knowledge of those facts." *Id.* at 2233.

The plurality then applied an objective test to determine whether the statement was "made for the purpose of proving the guilt of a particular criminal defendant at trial." *Id.* at 2243. The plurality concluded the Cellmark report was not testimonial because "the primary purpose of the Cellmark report, viewed objectively, was not to accuse petitioner or to create evidence for use at trial. When [law enforcement] sent the sample to Cellmark, its primary purpose was to catch a dangerous rapist who was still at large, not to obtain evidence for use against petitioner, who was neither in custody nor under suspicion at that time." *Id.* The plurality further opined that "no one at Cellmark could have possibly known that the profile that it produced would turn out to inculpate petitioner—or for that matter, anyone else whose

aminations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially' ") (citation omitted), *and Crawford,* 541 U.S. at 52, 124 S.Ct. 1354 ("Statements taken by police officers in the course of interrogations are also testimonial under even a narrow standard."). *United States v. Tearman,* 72 M.J. 54, 58–59 (C.A.A.F.2013) (alterations in original).

DNA profile was in a law enforcement database. Under these circumstances, there was no 'prospect of fabrication' and no incentive to produce anything other than a scientifically sound and reliable profile." *Id.* at 2243–44 (quoting *Michigan v. Bryant*, 562 U.S. 344, 131 S.Ct. 1143, 1157, 179 L.Ed.2d 93 (2011)).

Justice Thomas concurred in the judgment that the expert's statements did not violate the Confrontation Clause, but disagreed with the plurality's reasoning. He concluded that testimony offered to explain the basis for an expert's opinion is always offered for its truth, but ultimately concurred in affirming Williams' conviction on the basis that the Cellmark report "lacked the requisite 'formality and solemnity' to be considered 'testimonial' for purposes of the Confrontation Clause." *Id.* at 2255 (citing *Bryant*, 131 S.Ct. at 1167 (Thomas, J., concurring in judgment)). According to Justice Thomas, the Cellmark report lacked "the solemnity of an affidavit or deposition" because it was not a sworn or certified declaration of fact, nor was it "the product of any sort of formalized dialogue resembling custodial interrogation." *Id.* at 2260.

Writing for herself and three other justices, Justice Kagan disagreed in total with the rationale offered by the plurality, as well as Justice Thomas' "indicia of solemnity" test, and would have found the testimony violated the Confrontation Clause. She maintained the Cellmark report in *Williams* was identical to the one in *Bullcoming* and *Melendez–Diaz v. Massachusetts*, 557 U.S. 305, 129 S.Ct. 2527, 174 L.Ed.2d 314 (2009), and so "the substance of the report could come into evidence only if Williams had a chance to cross-examine the responsible analyst." *Id.* at 2266–67 (Kagan, J., dissenting). Justice Kagan rejected the proposition that the expert's testimony had not been offered for its truth, noting, "[A]dmission of the out-of-court statement in this context has no purpose separate from its truth; the factfinder can do nothing with it *except* assess its truth and so the credibility of the conclusion

it serves to buttress." *Id.* at 2269 (emphasis in the original). She also disagreed with the plurality's conclusion that the DNA report was "to respond to an ongoing emergency, rather than to create evidence for trial," noting that the expert had testified that the DNA report was conducted " 'for this criminal investigation ... [a]nd for the purpose of the eventual litigation'—in other words, for the purpose of producing evidence, not enabling emergency responders." *Id.* at 2274 (omission and alteration in original) (citation omitted).

### Analysis

We do not find *Williams* established a new "primary purpose" test for determining when a statement is considered testimonial. Although Williams' conviction was ultimately upheld based on Justice Thomas' concurrence, the Supreme Court's 4–1–4 split provided no clear guidance concerning the extent to which a surrogate expert may testify about testing performed by another analyst. *See Id.* at 2270, 2277 (Kagan, J., dissenting) ("What comes out of four Justices' desire to limit *Melendez–Diaz* and *Bullcoming* in whatever way possible, combined with one Justice's one-justice view of those holdings, is—to be frank—who knows what. Those decisions apparently no longer mean all that they say. Yet no one can tell in what way or to what extent they are altered because no proposed limitation commands the support of a majority."). [4]

In *Marks v. United States*, 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977), the Supreme Court held that "[w]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, 'the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.' " (quoting *Gregg v. Georgia*, 428 U.S. 153, 169 n. 15, 96 S.Ct. 2909, 49 L.Ed.2d 859 (1976)). "In practice, however, the *Marks* rule produces a determinate holding 'only when one opinion

---

4. Justice Kagan continued in her dissent: "I call Justice ALITO's opinion 'the plurality,' because that is the conventional term for it. But in all except its disposition, his opinion is a dissent: Five Justices specifically reject every aspect of its reasoning and every paragraph of its explication." *Williams v. Illinois*, — U.S. —, 132 S.Ct. 2221, 2265, 183 L.Ed.2d 89 (2012) (Kagan, J., dissenting).

is a logical subset of other, broader opinions.'" *United States v. Carrizales–Toledo,* 454 F.3d 1142, 1151 (10th Cir.2006) (quoting *King v. Palmer,* 950 F.2d 771, 781 (D.C.Cir. 1991) (en banc)). Applying *Marks* becomes problematic "[w]hen the plurality and concurring opinions take distinct approaches, and there is no 'narrowest opinion' representing the 'common denominator of the Court's reasoning.'" *Id.* (quoting *King,* 950 F.2d at 781, 782).

■ Consequently, because *Williams* does not provide a definitive test for determining when a statement is to be deemed testimonial, we will continue to apply our superior court's holding in *Sweeney*: "[A] statement is testimonial if 'made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial.'" *Sweeney,* 70 M.J. at 301 (quoting *Blazier I,* 68 M.J. at 442). Under this standard, we conclude that Mr. Fisher's findings and his statement specifically linking the DNA profile to the appellant by name were testimonial. When Mr. Davenport repeated Mr. Fisher's testimonial statements to the members, he violated the appellant's confrontation rights.

This case, unlike *Williams,* involved a jury trial[5] and a known suspect, against whom charges had been preferred, and who was in pretrial confinement for the suspected offense prior to the DNA testing. At the time Mr. Fisher created the DNA profiles, he knew the appellant's identity and further knew the results of his analysis would be turned over to the AFOSI for potential prosecution.[6] Applying *Sweeney,* we find the information placed in Mr. Fisher's report "clearly set forth the 'accusation'" critical to the Government's case: that the DNA found in the victim's sample specifically matched the appellant. Mr. Fisher's DNA analysis report is therefore testimonial. *See Blazier I,* 68 M.J. at 443; *United States v. Harcrow,* 66 M.J. 154, 159 (C.A.A.F.2008) (rejecting the Government's argument that laboratory reports will always be nontestimonial and noting that records and documents such as lab reports may be testimonial if and investigation is already pending against an individual and the testing is conducted by the Government to discover evidence).[7]

This case is unlike the typical urinalysis trial where a drug testing report is admitted into evidence tying the accused to the tested sample through chain of custody documents. Here, the prosecution did not admit Mr. Fisher's report. As a result, the only evidence the members received linking the male DNA profile found in the victim's swabs directly to the appellant—the penultimate issue in the case—came from Mr. Davenport's testimony.[8] We find as a matter of fact the

---

5. The *Williams* plurality opinion acknowledged "the dissent's argument [regarding whether the statement was made for the truth of the matter asserted] would have force if petitioner had elected to have a jury trial. In that event, there would have been a danger of the jury's taking [the state expert's] testimony as proof that the Cellmark profile was derived from the sample obtained from the victim's vaginal swabs. Absent an evaluation of the risk of juror confusion and careful jury instructions, the testimony could not have gone to the jury." 132 S.Ct. at 2237.

6. Whereas the *Williams* plurality opined that it is "beyond fanciful" that "shoddy lab work would somehow produce a DNA profile that just so happened to have the precise genetic makeup of petitioner, who just so happened to be picked out of a lineup by the victim," 132 S.Ct. at 2244, in this case it is not inconceivable that the appellant could argue that sample contamination, sample switching, mislabeling, or fraud could have produced test results matching the appellant's DNA profile to that found in the victim's sample. *See United States v. Sedillo,* 509 Fed.Appx. 676, 681

(10th Cir.2013) (Briscoe, C.J., dissenting). Whether that in fact occurred is not for this Court to determine; rather it is through confrontation and the crucible of cross-examination that permits the appellant to challenge Mr. Fisher's findings on these matters.

7. We reach the same conclusion applying the plurality test from *Williams,* as the testimony at trial was offered for the truth of the matter asserted and the appellant was a known suspect at the time the evidence was tested.

8. Mr. Davenport identified the appellant by name several times during his testimony:

> Q. [Trial Counsel] Let me ask you a general question as ... it relates to Airman Katso's kit. Having performed the technical review, have you formed an independent professional opinion as to whether Airman Katso's kit was tested per the procedure and protocol required at the lab?
> A. [Mr. Davenport] Yes.

record of trial does not definitively establish that Mr. Davenport had first-hand knowledge as to whom the known DNA sample or its corresponding profile belonged. He was able to identify the appellant by name only by repeating the testimonial statement contained in Mr. Fisher's report that directly linked the appellant to the generated DNA profile. Without this connection, Mr. Davenport could testify that in his expert opinion the two DNA profiles Mr. Fisher created by purifying, quantifying, and copying the DNA found in the swabs he analyzed matched one another in certain respects, but consistent with the Confrontation Clause, Mr. Davenport could not identify the appellant by name. *See United States v. Ayala*, 601 F.3d 256, 275 (4th Cir.2010) ("[T]he question when applying *Crawford* to expert testimony is 'whether the expert is, in essence, giving an independent judgment or merely acting as a transmitter for testimonial hearsay.'" (quot-

ing *United States v. Johnson*, 587 F.3d 625, 635 (4th Cir.2009))).

■ We disagree with the Government's premise that *Blazier II* controls the outcome of this case. In *Blazier II*, our superior court acknowledged that an expert witness may review and rely upon the work of others, to include laboratory analysis, without violating the Confrontation Clause, so long as that expert reaches his or her own opinions in compliance with Mil. R. Evid. 702 and Mil. R. Evid. 703. *Blazier II*, 69 M.J. at 224–25. Thus, Mr. Davenport could rely on Mr. Fisher's creation of various DNA profiles to conduct and testify about his own statistical testing (following steps 3–7 above) concerning the likelihood of a match between the DNA profiles. What he could not do, though, was to "act as a conduit for repeating testimonial hearsay." *Id.* at 225. Mr. Davenport did so by repeating testimonial statements contained in Mr. Fisher's report,

Q. And what is that opinion?
A. That the kit was tested per protocol and there were items in that kit that went through the DNA analysis procedure.
....
Q. Do you have an opinion whether DNA profiles were generated for known samples for both [Senior Airman (SrA) CA] and the accused?
A. Yes, they were.
Q. What is your opinion?
A. There were DNA profiles from the known blood of [SrA CA] and Katso.
Q. Directing your attention now to the rectal swab that was taken from [SrA CA]. Based on your review, have you formed an independent opinion whether DNA was present on Airman [SrA CA]'s rectal swab?
A. Yes.
Q. What is that opinion?
A. There was a mixture of DNA profiles consistent with coming from two individuals from the rectal swabs of [SrA CA]. The non-semen DNA profile matched the DNA profile of [SrA CA]. The remaining partial semen DNA profile is consistent with Katso.
Q. The accused in this case?
A. Yes.
....
Q. And, Mr. Davenport, you said the semen DNA profile, in your opinion, was consistent with the accused, Airman Katso?
A. That's correct.
....
Q. Directing your attention now to the penile head swab that was taken from the accused. Based on your technical review, have you formed an independent opinion whether DNA

was present on the accused's penile head swab?
A. Yes.
Q. What is that opinion?
A. On the penile head swabs, there were [sic] a mixture of DNA profiles consistent with two individuals. The one contributor was consistent with Katso and the remaining contributor was consistent with [SrA CA].
....
Q. Now, directing your attention now to penile shaft swab that was taken from the accused. Based on your technical review, have you formed an independent opinion whether DNA was present on the accused's penile shaft swab?
A. Yes.
Q. And what is that opinion?
A. A mixture of DNA profile consistent with coming from two individual ways found on the penile shaft swabs. One contributor was consistent with Katso and the remaining contributor is consistent with [SrA CA].
....
Q. And finally, Mr. Davenport, directing your attention now to the swab that was taken from the accused's scrotum. Based on your technical review, have you formed an independent opinion whether DNA was present on the accused's scrotum swab?
A. Yes.
Q. What is that opinion?
A. A mixture of DNA profiles from at least two individuals was found on the scrotum swabs. One contributor is consistent with Katso and the remaining contributor is consistent with [SrA CA].

namely that the DNA profile found on the evidentiary samples from SrA CA specifically came from the appellant. Mr. Davenport could not form an independent conclusion that the *known* DNA in the analysis he reviewed came from the appellant because his review was limited to repeating statistical comparisons performed after Mr. Fisher had already done all the hands on work necessary to properly prepare the samples for the machine-generated portions of the analysis.[9] Because Mr. Davenport repeated testimonial hearsay to the factfinder, the appellant's right to confront Mr. Fisher was violated.

### Constitutional Error

■■■ Having found constitutional error, we must determine whether it is harmless beyond a reasonable doubt. We conduct this review de novo. *United States v. Kreutzer,* 61 M.J. 293, 299 (C.A.A.F.2005). In the context of an erroneous admission of testimonial hearsay, the question is not whether the evidence is legally sufficient to uphold a conviction without the erroneously admitted evidence; rather, " '[t]he question is whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' " *Chapman v. California,* 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705 .(1967) (quoting *Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963)). As the party who benefited from this constitutional error, the Government bears the burden of establishing that it had no causal effect upon the findings. *United States v. Simmons,* 59 M.J. 485, 489 (C.A.A.F.2004). To do so, the Government must exclude the "reasonable possibility that the evidence complained of might have contributed to the conviction." *Fahy,* 375 U.S. at 86–87, 84 S.Ct. 229. *See also Kreutzer,* 61 M.J. at 300 (holding the Government was required to demonstrate there was no reasonable possibility that the presence of two testimonial statements contributed to the contested findings of guilty).

■■■ To say that a constitutional error did not contribute to the verdict is to find that error unimportant in relation to everything else the jury considered on the issue in question, as contained in the record. *United States v. Othuru,* 65 M.J. 375, 377 (C.A.A.F. 2007) (citing *Yates v. Evatt,* 500 U.S. 391, 403, 111 S.Ct. 1884, 114 L.Ed.2d 432 (1991) *overruled on other grounds by Estelle v. McGuire,* 502 U.S. 62, 72 n. 4, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991)). In this light we will not affirm the appellant's conviction unless the Government convinces us beyond a reasonable doubt that the "constitutional error was not a factor in obtaining that conviction." *Kreutzer,* 61 M.J. at 298–99. In *Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), the Supreme Court stated the test for harmless error could be satisfied where there is overwhelming evidence of guilt. Among the factors we consider are: (1) The importance of the testimonial hearsay to the Government's case; (2) Whether the testimonial hearsay was cumulative; (3) The existence of other corroborating evidence; (4) The extent of confrontation permitted; and (5) The strength of the Government's case. *Sweeney,* 70 M.J. at 306 (citing *Delaware v. Van Arsdall,* 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)). Applying those *Van Arsdall* factors to the case before us, we find the admission of the testimonial hearsay was not harmless beyond a reasonable doubt.

The Government's case was based on the strength of SrA CA's identification of the appellant, circumstantial evidence regarding text and online communications the appellant had with SrA CA throughout the day and evening leading up to the assault, the appellant's demeanor and answers he gave AFOSI investigators in response to questions about his previous interaction with, or knowledge of, SrA CA, and Mr. Davenport's testimony matching the appellant's DNA with DNA found on the victim. The Government's case was not without its problems, however. SrA CA testified that she and the appellant were not close acquaintances, having only met two

---

9. Although trial counsel included the phrase "in your independent opinion," or some version thereof in the key questions he asked Mr. Davenport, simply inserting such phrases into a question does not transform an exchange containing testimonial hearsay into something else where a predicate fact presumed in the question's wording is, itself, testimonial hearsay.

weeks before her birthday. He did not accompany SrA CA to dinner nor was he at the dormitory dayroom when she had several drinks before leaving for an off-base bar. Although the appellant was at the bar, his arrival was not coordinated with SrA CA, and he did not leave with her that evening. In fact, other witnesses testified that he went to another Airman's off-base apartment before returning to base to play video games with two other Airmen. No witnesses observed the appellant entering or leaving SrA CA's room. After SrA CA identified the appellant, AFOSI arrived at the appellant's room to question him within an hour of her report. However, the appellant was so unresponsive due to his own alcohol consumption he had to be given medical attention before he could be questioned.

SrA CA stated she had almost no recollection of what happened after leaving the dayroom and arriving at the bar. While others testified to seeing SrA CA sitting on the appellant's lap at the bar, she does not remember seeing the appellant or talking with him that evening. Her last clear memory was leaving the dayroom and then waking in her bed when she felt someone having sexual intercourse with her. She testified that although there was little light in the room she was able to see his features "like a black and white photo" and was able to identify the appellant through touch and/or sight of certain items he was wearing, including a beanie cap, glasses, a coat, and a pair of jeans. However, the investigating agent also testified that no forensic evidence matching the appellant, to include hairs or clothing fibers, was found in SrA CA's room.

Based on the totality of the evidence presented, we find the Government has failed to demonstrate that the DNA evidence played an insignificant role in the Government's case, and that the testimonial hearsay was an important piece of evidence leading to the appellant's conviction.[10] We are therefore not convinced beyond a reasonable doubt that the constitutional error was not a factor in obtaining that conviction. *See Kreutzer,*

61 M.J. at 299. We cannot turn a blind eye to the evidentiary power of DNA testimony for purposes of incriminating and exonerating suspects. Shelton, Donald E., *Twenty-First Century Forensic Science Challenges for Trial Judges in Criminal Cases: Where the "Polybutadiene" Meets the "Bitumen,"* 18 WIDENER L.J. 309, 321–22 (2009) ("Although the forensic use of nuclear DNA is barely 20 years old, DNA typing is now universally recognized as the standard against which many other forensic individualization techniques are judged. DNA enjoys this preeminent position because of its reliability and the fact that, absent fraud or an error in labeling or handling, the probabilities of a false positive are quantifiable and often miniscule."). We are convinced there is a reasonable possibility, if not probability, the DNA evidence contributed to the appellant's conviction and was certainly not "unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *Othuru,* 65 M.J. at 377 (quoting *Yates,* 500 U.S. at 403, 111 S.Ct. 1884). Consequently, we are compelled to set aside Charge I and its Specification.

### Housebreaking

For the same reasons we must set aside Charge I, we are likewise required to set aside Charge II's allegation of housebreaking. The only direct evidence linking the appellant to being inside SrA CA's room to carry out the sexual attack is her testimony and the corroborative DNA evidence. Based on the entire record, we are persuaded that, as above, the inadmissible use of the DNA testimony was a factor in obtaining the conviction on Charge II.

### Failure to State an Offense

The appellant was also charged with unlawfully entering SrA CA's dwelling in violation of Article 134, UCMJ, although that specification did not allege the terminal element. *See United States v. Fosler,* 70 M.J. 225 (C.A.A.F.2011). After a thorough review of the trial record, we do not find the missing element was extant on the record or essentially uncontroverted. Therefore, the appel-

---

10. Trial counsel indicated to the military judge that the identity of SrA CA's attacker would be an issue in the case and that confirmation of her

identification of the appellant through the DNA testing would be "a substantial piece of evidence."

lant was not placed on sufficient notice of the alleged crime and consistent with the requirements established in *Fosler* and *United States v. Humphries,* 71 M.J. 209 (C.A.A.F. 2012), we are compelled to set aside and dismiss Charge III and its Specification.

## Conclusion

The findings of guilty and the sentence are set aside and dismissed. A rehearing is authorized.

MARKSTEINER, Senior Judge (concurring):

I concur with Chief Judge Roan's analysis and conclusion, but I write separately in order to ensure I have framed the issue on which I believe this case ultimately turns – the standard we are to apply when addressing the prejudice caused by Confrontation Clause errors.

I also write separately to respectfully note my disagreement with our dissenting colleague's conclusion as to prejudice. He essentially says the DNA evidence was not important because the appellant did not contest that he and Senior Airman (SrA) CA had sex; rather his defense was limited to consent or mistake of fact as to consent. Had the defense not objected to Mr. Davenport's testimonial hearsay at the outset, I would find this conclusion more persuasive. However, as the case played out, once the military judge ruled against the appellant on the admissibility of Mr. Davenport's statement linking the sample he tested to the appellant, it would have been beyond benign futility— indeed it would likely have been affirmatively detrimental to the appellant's case—to argue the appellant did not have sex with SrA CA. Accordingly, to the extent the appellant resorted to litigating consent, the sequence of events strongly suggests that he did so only because the trial judge's decision to admit Mr. Davenport's testimonial hearsay left him no alternative.

With regard to the standard we apply, if I were to evaluate the case now before us on factual and legal sufficiency grounds, I would have little hesitation affirming the findings and sentence for many of the reasons trial counsel addressed in closing argument. The

record contains evidence that the appellant was interested in SrA CA, that with knowledge of her intention to get drunk on her birthday he followed her movements and eventually connected with a very intoxicated SrA CA at a bar later that night. When SrA CA's friend tried to remove her from the appellant's lap to take her home, the appellant resisted, telling the friend, "I'll take care of her." The friend ultimately removed SrA CA, but the appellant continued to follow up on SrA CA's activities using social media until she stopped responding to posts sometime after 0253 hrs, when the appellant posted to her Facebook page: "hay [* * * * * *] ... u had a good night ....u were alllll f[* *]kered up..no f[* *]kin doubt.. hope u got home safe ... thank tiff for me."

Approximately two hours later, the victim awakened to someone violating her. She testified that although there was little light in the room she was able to see his features "like a black and white photo" and was able to identify the appellant through touch and visual recognition of certain items he was wearing, including a beanie cap, glasses, a coat, and a pair of jeans. Later, when questioned about his activities the night of the assault, the appellant was, to even an untrained interrogator, evasive and demonstrably untruthful in his responses. The video of his interrogation was entered into evidence.

Read in isolation, the "harmlessness beyond a reasonable doubt" test as articulated in *Harrington v. California,* 395 U.S. 250, 254, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969), could be understood to be a less exacting standard than that which we must apply. In *Harrington,* the Supreme Court stated the test for harmless error could be satisfied where there is overwhelming evidence of guilt. *Id.* Harrington, a Caucasian, was convicted along with three non-Caucasians, for their participation in an attempted robbery and murder. The Court reviewed the case to determine whether the admission of two of the participants' written confessions implicating the appellant, over his objection at trial, constituted a non-harmless Confrontation Clause violation. Discussing the issue, the court recounted the evidence against Harrington at trial:

Petitioner made statements which fell short of a confession but which placed him at the scene of the crime. He admitted that [another participant] was the trigger man; that he fled with the other three; and that after the murder he dyed his hair black and shaved off his moustache. Several eyewitnesses placed petitioner at the scene of the crime. But two of them had previously told the police that four [African-Americans] committed the crime. [One of the participants in the crime, who testified at trial] placed [Harrington] in the store with a gun at the time of the murder.

. . . .

. . . Harrington himself agreed he was there. Others testified he had a gun and was an active participant. [The participants' whose confessions were admitted] did not put a gun in his hands when he denied it. They did place him at the scene of the crime. But others, including Harrington himself, did the same. Their evidence, supplied through their confessions, was of course cumulative.

*Id.* at 252–54, 89 S.Ct. 1726 (footnote omitted).

The Court went on to reemphasize its admonition, previously noted in *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), "against giving too much emphasis to 'overwhelming evidence' of guilt." *Harrington,* 395 U.S. at 254, 89 S.Ct. 1726. Further confirming its position, the Court noted, "We do not depart from *Chapman*; nor do we dilute it by inference. We reaffirm it." *Id.*

Although the case against the appellant was certainly solid, it was not as overwhelming as was the case against Harrington, at least up until the point at which the trial judge admitted Mr. Davenport's testimony. On the contrary, the primary point to which Mr. Davenport testified was that DNA evidence established what amounts to a near mathematical certainty that the appellant—not just a nameless sample he tested for comparative purposes—had sex with SrA CA. The demonstrative exhibits trial counsel used during closing argument underscored this point.

Moreover, the weight of authority represented in the other cases construing "harmlessness" in this context, as referenced by the Chief Judge above, confirms that in order for us to affirm the conviction we must find not merely that the Government would have secured a conviction absent the wrongly admitted evidence. Rather, we may not affirm if there is a " 'reasonable *possibility*' " that the erroneously admitted evidence " '*might have* contributed to the conviction.' " *United States v. Blazier,* 69 M.J. 218, 227, (C.A.A.F. 2010) (quoting *Chapman,* 386 U.S. at 23, 87 S.Ct. 824) (emphasis added).

On the facts of this case as presented, I believe it is simply impossible to *unring* the DNA evidence bell in a fashion that would enable us to find no reasonable possibility that Mr. Davenport's testimony might have contributed to the conviction. I therefore respectfully concur.

ORR, Senior Judge (concurring in part and dissenting in part):

I concur with the majority's conclusion that Mr. Davenport's testimony amounted to testimonial hearsay. I also agree that the specification of Charge III fails to state an offense and must be set aside. However, for the reasons I discuss below, I would affirm the findings of guilt for Charge I and Charge II and their respective specifications.

We review de novo whether a constitutional error is harmless beyond a reasonable doubt. *United States v. Kreutzer,* 61 M.J. 293, 299 (C.A.A.F.2005). In assessing constitutional error, the question is not whether the admissible evidence is sufficient to uphold a conviction but " 'whether there is a reasonable possibility that the evidence complained of might have contributed to the conviction.' " *Chapman v. California,* 386 U.S. 18, 23, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) (quoting *Fahy v. Connecticut,* 375 U.S. 85, 86–87, 84 S.Ct. 229, 11 L.Ed.2d 171 (1963)). Among the factors we consider are: (1) The importance of the testimonial hearsay to the prosecution's case; (2) Whether the testimonial hearsay was cumulative; (3) The existence of other corroborating evidence; (4) The extent of confrontation permitted; and (5) The strength of the prosecution's

case. *United States v. Sweeney*, 70 M.J. 296, 306 (C.A.A.F.2011) (citing *Delaware v. Van Arsdall*, 475 U.S. 673, 684, 106 S.Ct. 1431, 89 L.Ed.2d 674 (1986)).

After the military judge properly admitted the portions of Mr. Davenport's testimony describing the process he used in analyzing the DNA samples and that Senior Airman (SrA) CA's sample contained semen, the only issue in dispute was whether the sexual activity was consensual. The crux of the appellant's argument is the portion of Mr. Davenport's testimony explaining that the appellant's DNA matched the semen found in SrA CA's sample led to his conviction. I disagree. Given SrA CA's fresh complaint and identification of the appellant as her attacker, this case was not about whether the appellant and SrA engaged in sexual intercourse. The sole issue before the panel members was whether SrA CA consented to the sexual activity.

While trial defense counsel ably argued to the military judge that Mr. Davenport's testimony was testimonial in nature, he took a completely different approach during his cross-examination of Mr. Davenport before the members. Rather than implying that Mr. Davenport was simply repeating Mr. Fisher's initial findings or attempting to show that the DNA findings were not accurate, trial defense counsel instead emphasized that the DNA results could not indicate whether the sexual interactions were consensual or where they might have taken place. In fact, during her findings summation, trial defense counsel's fleeting reference to DNA consisted of the following:

> Now, another thing that they gave you was a whole bunch of numbers and all these things with DNA evidence. We

barely had any questions for the DNA expert because ultimately his boy parts were on her girl parts. Her girl parts were on his boy parts. That doesn't tell us anything else.

> It doesn't tell us whether or not she was consenting. It doesn't tell us whether or not she was actively engaging in intercourse. It doesn't tell us where the sex occurred. Nobody can tell us where the sex occurred except·for what Airman [CA] remembers after [she] blacked out for four or five hours. That didn't tell you much of anything.

Given the facts and circumstances of this case, trial defense counsel chose to focus their strategy on whether SrA CA was in fact substantially incapacitated as the Government contended, whether she consented to sexual intercourse with the appellant, and whether her complaints were the product of her regretting her decisions. Trial defense counsel's approach was reasonable under the circumstances and we will not second guess this decision. However, it does diminish the argument that he was materially prejudiced by his inability to cross-examine the original analyst. Having viewed the entire record and balancing the *Van Arsdall* factors, above, I am convinced that Mr. Davenport's repetition of testimonial hearsay was harmless beyond a reasonable doubt. Therefore, I must respectfully dissent.